**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| LINDGREN CHYI | : | CIVIL ACTION NO. |
| 550 Hallandale Drive | | |
| Fairlawn, OH  44333 | : | JUDGE |
| | | |
| and | : | |
| | | |
| LUCY CHYI | : | |
| 550 Hallandale Drive | | |
| Fairlawn, OH  44333 | : | |
| | | |
| and | : | |
| | | |
| EDMUND EISNAUGLE | : | |
| 1555 Hiram | | |
| Niles, OH  44446 | : | |
| | | |
| and | : | |
| | | |
| SANDY EISNAUGLE | : | **COMPLAINT FOR MEDICAL NEGLIGENCE;** |
| 1555 Hiram | | **FRAUD; MISREPRESENTATION;** |
| Niles, OH  44446 | : | **DECLARATORY CHALLENGES TO STATE** |
| | | **TORT REFORM (S.B.80 [AS APPLICABLE** |
| and | : | **TO MEDICAL NEGLIGENCE/MALPRACTICE]** |
| | | **S.B. 382, H.B. 215); PRODUCTS LIABILITY;** |
| MARK FULMER | : | **OTHER CONTRACTUAL, TORT AND/OR** |
| 3490 Layer Rd. SW | | **STATUTORY CAUSES OF ACTION AND** |
| Lordstown, OH  44481 | : | **CLAIMS SET FORTH PURSUANT TO LAW;** |
| | | **JURY DEMAND** |
| and | : | **(DIVERSITY JURISDICTION)** |
| | | |
| KAREN FULMER | : | |
| 3490 Layer Rd. SW | | |
| Lordstown, OH  44481 | : | |
| | | |
| and | : | |
| | | |
| DANIEL GAGLIANO | : | |
| 8750 Kimblewick Lane | | |

1

Trumbull, OH  44484                          :
(CLAIM FOR PRODUCTS LIABILITY
AGAINST INTUITIVE ONLY)                      :

    and                  :

CONCETTA GAGLIANO                            :
8750 Kimblewick Lane
Trumbull, OH  44484                          :
(CLAIMS FOR PRODUCTS LIABILITY
AGAINST INTUITIVE ONLY)                      :

    and                  :

MICHAEL MERGLER                              :
3451 Valleywood Drive
Kettering, OH  45429                         :

    and                  :

JACINTA MERGLER                              :
3451 Valleywood Drive
Kettering, OH  45429                         :

    and                  :

JOHN PERROTTI                               :
226 Rose Hill Drive
New Castle, PA  16105                        :

    and                  :

ANN PERROTTI                                :
226 Rose Hill Drive
New Castle, PA  16105                        :

    and                  :

JOHN RAZEM                                  :
1772 North Allen St.
State College, PA  16803                     :

    and                  :

2

CAROL RAZEM                          :
1772 North Allen Drive
State College, PA  16803             :

     and                       :

CAROL SPOSIT, Executor of
The Estate of DONAL SPOSIT,          :
Deceased
7500 Harley Hills                    :
North Royalton, OH  44133
                                     :
     and
                                     :
CAROL SPOSIT
7500 Harley Hills
North Royalton, OH  44133            :

     and                       :

DENNIS WADE                          :
17660 Thompson Road
Thompson, OH  44086                  :

     and                       :

DENISE WADE                          :
17660 Thompson Road
Thompson, OH  44086                  :

     and                       :

FRED WILLIAMS, JR.                   :
666 Olivesburg Road
Mansfield, OH  44905                 :

     and                       :

MICHELLE DABNEY                      :
2515 Burnett Avenue, Apt. 1015
Cincinnati, OH  45219                :

     and                       :

3

LINDA D. JULIOUS                          :
93 Highland Ave.
Covington, KY  41011                       :

    and                            :

CONSTANCE POWELL                          :
c/o BRENDA PATTON
1531 Franklin Avenue                      :
Cincinnati, OH  45237
                                          :

    and                            :

REGINALD EVANS                            :
1758 Wayside Road
Cleveland, OH  44112                      :

    and                            :

BRIAN D. FERGUSON                         :
2698 Deming Ave.
Columbus, OH  43202                       :

    and                            :

JOSEPH LACKAY                             :
7220 Irish Rose Land
Pinkerington, OH  43147                   :

    and                            :

SHELLY MATTHEW                            :
521 Keeler Rd.
Galipolis, OH  45631                      :

    and                            :

LAURA MCNEAL                              :
5219 E. 500 North, Lot 17
Leesburg, IN  46538                       :

    and                            :

KIMBALL PETTIFORD                         :

708 2ND Street
Washington Courthouse, OH  43160          :

     and          :

JAMES ABRAHAM          :
2530 Home Acre Dr.
Columbus, OH  43231          :

     and          :

RAYMOND BARKHEIMER          :
871 N. Bellevue
Dover, OH  44642          :

     and          :

DONALD BENTLEY          :
P O Box 87
Dunkin Springs, OH  45172
                          :

     and          :

ROBERT BOBO          :
33814 St. Rt. 124
Rutland, OH  45775
                          :

     and          :

MELISSA CHERESNICK          :
183 Fairpark Rd.
Pearcy, AR  71964
                          :

     and          :

DEBRA CLINE          :
1824 Grandview Avenue
Portsmouth, OH  45662
                          :

     and          :

DAWSON COKER          :
1415 Waverly Avenue
Toledo, OH  43607

and                                          :

PATRICIA COKER                               :
1415 Waverly Avenue
Toledo, OH  43607                            :

            and                              :

JENNIFER COLEMAN                             :
4400 Genesee
Dayton, OH  45406                            :

            and                              :

WILLIAM COX                                  :
352 Dixon Road
Petersburg, MI  49270                        :

            and                              :

ANNETTE COURTNEY                             :
409 Eastern Ave.
Toledo, OH  43609                            :

            and                              :

RUTH CRONK                                   :
703 Cooks Hill Court
Mount Juliet, TN  37122                      :

            and                              :

JACK CRONK                                   :
703 Cooks Hill Court
Mount Juliet, TN  37122                      :

            and                              :

CHARLES DENNY                                :
1960 Mimosa Tr
Florence, KY  41042                          :

            and                              :

CARMITA FOSTER                          :
3096 Weirton Drive
Columbus, OH  43207                     :

    and                                :

LARRY GRAHAM                            :
3048 Fair Ave.
Columbus, OH   43209                    :

    and                                :

ARTHUR GREEN                            :
4424 Airport Highway, Apt. 62
Toledo, OH  43615                       :

    and                                :

NATHANIEL GRIFFITH                      :
7460 Elbrook Avenue
Cincinnati, OH  45237                   :

    and                                :

LORI BARBER GRIFFITH                    :
7460 Elbrook Avenue
Cincinnati, OH  45237                   :

    and                                :

ARALLA HARRINGTON                       :
2449 Tennessee
Xenia, OH   45385                       :

    and                                :

GREGG HARTSOCK                          :
2101 Freeman
Hamilton, OH   45015                    :

    and                                :

7

ERNIE HASTY                              :
4533 Bigger Road
Kettering, OH  45440                     :

    and                                  :

MARY HASTY                               :
4533 Bigger Road
Kettering, OH  45440                     :

    and                                  :

CECELIA HILL                             :
3728 Jackmen Street
Toledo, OH  43612                        :

    and                                  :

JACQUELINE HOKE                          :
8811 Robin Rd.
South Charleston, OH  45368              :

    and                                  :

JAMES HOKE                               :
8811 Robin Rd.
South Charleston, OH   45368             :

    and                                  :

CAROLYN HUDGINS                          :
1294 Minnesota
Columbus, OH  43211                      :

    and                                  :

ALLISON JOHNSON                          :
1421 Allanwood Lane
Dayton, OH  45432                        :

    and                                  :

BRENDA JOHNSON                                    :
1620 Norcol Lane
Cincinnati, OH  45231                             :

          and                                    :

TINA KIRKBRIDE BEACH,                             :
Admnx. of the Estate of Walter
Kirkbride, deceased                              :
315 Camden Road
Zanesville, OH  43701                            :

          and                                    :

MARTHA KIRKBRIDE                                  :
315 Camden Road
Zanesville, OH  43701                            :

          and                                    :

LARRY KRATZER                                     :
15017 Fosnight Road
Orrville, OH  44667                               :

          and                                    :

REBECCA KRATZER                                   :
15017 Fosnight Road
Orrville, OH  44667                               :

          and                                    :

CARMEN LOONEY                                     :
964 Elliot Street
St. Albans, WV  25177                            :

          and                                    :

ROBERT MOODY                                      :
344 Meadowbrook Avenue SE
Warren, OH  44483                                :

          and                                    :

9

KATHY MOODY                                    :
344 Meadowbrook Avenue 23
Warren, OH  44483                              :

    and                    :

CHRISTEL MURDOCCO                              :
14267 Bellridge
Navarre, OH  44662                             :

    and                    :

MARK MURDOCCO                                  :
14267 Bellridge
Navarre, OH   44662                            :

    and                    :

RALPH NAPOLITANO                               :
720 Hawks Crest Lane
Blacklick, OH  43004                           :

    and                    :

EMILY NAPOLITANO                               :
720 Hawks Crest Lane
Blacklick, OH  43004                           :

    and                    :

TRACY NEAL                                     :
5692 Kingsboro Drive
Colorado Springs, CO  80911                    :

    and                    :

DANNY NEAL                                     :
5692 Kingsboro Drive
Colorado Springs, CO  80911                    :

    and                    :

GREG PATTON                                    :
451 Glensprings
Cincinnati, OH  45246                          :

    and                    :

CRYSTAL PHIPPS                                 :
1202 Nelson Rd.
Louisville, OH   45648                         :

    and                    :

MERIDITH RICKETTS                              :
1008 Lincoln Ave.
Toledo, OH  43607                              :

    and                    :

INA RIFFE                                      :
315 Pebblestone Dr.
Monroe, OH  45050                              :

    and                    :

CATHERINE SCIENCE                              :
1691 Uplands
Springfield, OH  45506                         :

    and                    :

AMY STEINMETZ                                  :
4232 Wigeon Place
Batavia, OH  45103                             :

    and                    :

KRISTY WATTS                                   :
1095 Park Lane
Middletown, OH   45042                         :

    and                    :

MIKE WINNERS                          :
2000 S. Clinton Street
Defiance, OH  43512                   :

    and                         :

DIANE WINNERS                        :
2000 S. Clinton Street
Defiance, OH  43512                   :

    PLAINTIFFS,              :


v.                                    :


INTUITIVE SURGICAL, INC.             :
c/o its Statutory Agent
CT Corporation System                :
1300 East 9th St.
Cleveland, Ohio 44114                 :

    and                         :

INTUITIVE SURGICAL, INC.             :
1266 Kifer Rd., #101
Sunnyvale, CA 94086                   :

    and                         :

CLEVELAND CLINIC FOUNDATION:
c/o its Statutory Agent
CT Corporation System                :
1300 E. 9th St.
Cleveland, OH   44114                 :

    and                         :

DELOS COSGROVE, M.D.                 :
CEO of the Cleveland Clinic
Foundation                            :
Cleveland Clinic Main Campus
Mail Code NA4                         :
9500 Euclid Ave.

Cleveland, OH  44195                          :

     and                              :

JIHAD KAOUK, M.D.                             :
Director, Center for Robotic
and Image Guided Surgery                      :
Cleveland Clinic Main Campus
Mail Code Q10-1                               :
9500 Euclid Ave
Cleveland, OH  44195                          :

     and                              :

RAJ GOEL, M.D.                                :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                       :
Cleveland, OH  44195
                                              :
     and
                                              :
JOHN ZHAO, M.D.
Cleveland Clinic Main Campus                  :
9500 Euclid Ave. #A100
Cleveland, OH  44195                          :

     and                              :

INDIBAR GILL, M.D.                            :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                       :
Cleveland, OH   44195
                                              :
     and
                                              :
JASON HAFRON, M.D.
Cleveland Clinic Main Campus                  :
9500 Euclid Ave.  #A100
Cleveland, OH  44195                          :

     and                              :

NICHOLAS HEGARTY, M.D.                      :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                     :
Cleveland, OH  44195

     and                                      :

JOHN KEFER, M.D.                            :
Cleveland Clinic Main Campus
9500 Euclid Ave.     #A100                  :
Cleveland, OH   44195
                                            :
     and

UNA LEE, M.D.                               :
Cleveland Clinic Main Campus
9500 Euclid Ave.     #A100                  :
Cleveland, OH   44195

     and                                      :

WHITE WESLEY MATTHEWS, M.D.                 :
Cleveland Clinic Main Campus
9500 Euclid Ave.     #A100                  :
Cleveland, OH   44195
                                            :
     and

ANDREW STEPHENSON, M.D.                     :
Cleveland Clinic Main Campus
9500 Euclid Ave.     #A100                  :
Cleveland, OH   44195
                                            :
     and

HADLEY WOOD, M.D.                           :
Cleveland Clinic Main Campus
9500 Euclid Ave.     #A100                  :
Cleveland, OH   44195
                                            :
     and

CARVELL NGUYEN, M.D.                    :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                 :
Cleveland, OH  44195

                                        :
         and
                                        :
CHRISTOPHER WEIGHT, M.D.
Cleveland Clinic Main Campus            :
9500 Euclid Ave.  #A100
Cleveland, OH   44195                   :

         and                            :

VAIRAVAN SUBRAMANIAN, M.D.              :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                 :
Cleveland, OH   44195

                                        :
         and
                                        :
MONISH ARON, M.D.
Cleveland Clinic Main Campus            :
9500 Euclid Ave.  #A100
Cleveland, OH   44195                   :

                                        :
         and
                                        :
KEVIN EL-HAYEK, M.D.                    :
Cleveland Clinic Main Campus
9500 Euclid Ave.  #A100                 :
Cleveland, OH   44195

         and                            :

J. MICHAEL HENDERSON, M.D.             :
Chief Quality Officer
Cleveland Clinic Health System          :
Mail Code E32
9500 Euclid Ave.                        :
Cleveland, OH  44195

15

and                                              :

MEDICARE SECONDARY PAYER         :
RECOVERY CONTRACTOR
P O Box 138832                                   :
Oklahoma City,  OK  73113
                                                 :

       and                                       :

                                                 :
ANTHEM BLUE CROSS AND
BLUE SHIELD                                      :
P O Box 105557
Atlanta  GA  30348                               :

       and                                       :

OHIO DEPARTMENT OF JOB           :
AND FAMILY SERVICES
TORT RECOVERY                                    :
350 Worthington Rd.  Suite G
Westerville  OH  43082                           :

       and                                       :

UNITED HEALTH CARE               :
6601 Centerville Business Parkway
Centerville, OH   45459                          :

       and                                       :

JANE AND/OR JOHN DOES,           :
Who Are Physicians, Physician
Professional Corporations and/or                 :
Other Health Care Providers that
Provided Treatment to Plaintiff, and/or
Health Insurance Payors                          :
Whose Identities are Unknown but
Shall be Ascertained Through                      :
Discovery


              Defendants                         :

_____

16

Now come the Plaintiffs and as and for their Complaint do hereby state as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and pendant and supplemental jurisdiction over all state-law claims pursuant to 28 U.S.C. § 1367.

2.     The Court has jurisdiction to make Federal declaratory judgment under 28 U.S.C. §2201, and Federal Rule of Civil Procedure 57, and state declaratory judgment pursuant to Ohio Rev. Code § 2721.01, et seq. and Ohio Civil Rule 57.  Further all other relief may include relief under 28 U.S.C. § 1651 (All Writs Act).

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

4.     Both products liability, medical negligence, and other claims are brought against "Cleveland Clinic Defendants".

5.     Products claims are brought on behalf of Plaintiffs who had surgeries at state institutions utilizing da Vinci robotic surgery.  These institutes can only be sued under R.C. 2743.02,et seq for medical and other claims.

## PARTIES

6.     Plaintiff Lindgren Chyi (hereinafter "Chyi") at all times relevant herein was a resident of Fairlawn, Summit County, Ohio.

7.     Plaintiff, Lucy Chyi at all times relevant herein was a resident of Fairlawn, Summit County, Ohio.  Plaintiff Lucy Chyi is the wife of Plaintiff Lindgren Chyi.

8. Plaintiff, Edmund Eisnaugle (hereinafter "Eisnaugle") at all times relevant herein was a resident of Niles, Trumbull County, Ohio.

9. Plaintiff, Sandy Eisnaugle at all times relevant herein was a resident of Niles, Trumbull County, Ohio. Sandy Eisnaughle is the wife of Edmund Eisnaugle.

10. Plaintiff, Mark Fulmer (hereinafter "Fulmer) at all times relevant herein was a resident of Lordstown, Trumbull County, Ohio.

11. Plaintiff, Karen Fulmer at all times relevant herein was a resident of Lordstown, Trumbull County, Ohio. Plaintiff Karen Fulmer is the wife of Plaintiff Mark Fulmer.

12. Plaintiff Daniel Gagliano (hereinafter "Gagliano") at all times relevant herein was a resident of Trumbull, Summit County, Ohio.

13. Plaintiff Concetta Gagliano at all times relevant herein was a resident of Trumbull, Summit County, Ohio. Plaintiff Concetta Gagliano is the wife of Daniel Gagliano.

14. Plaintiff, Michael Mergler, (hereinafter "Mergler") at all times relevant herein was a resident of Kettering, Montgomery County, Ohio.

15. Plaintiff Jacinta Mergler at all times relevant herein was a resident of Kettering, Montgomery County, Ohio. Plaintiff Jacinta Mergler is the wife of Plaintiff Michael Mergler.

16. Plaintiff John Perrotti, (hereinafter Perrotti")  at all times relevant herein was a resident of New Castle, Lawrence County, Pennsylvania.

17.   Plaintiff Ann Perrotti, at all times relevant herein was a resident of New Castle, Lawrence County, Pennsylvania.  Ann Perrotti is the wife of John Perrotti.

18.   Plaintiff, John Razem,  (hereinafter "Razem") at all times relevant herein was a resident of State College, Centre County, Pennsylvania.

19.   Plaintiff Carol Razem at all times relevant herein was a resident of State College, Centre County, Pennsylvania.  Carol Razem is the wife of John Razem.

20.   Plaintiff Donal Sposit, (hereinafter "Sposit") at all times relevant herein, was a resident of North Royalton, Medina County, Ohio.  Donal Sposit is deceased.

21.   Plaintiff Carol Sposit at all times relevant herein, is a resident of North Royalton, Medina County, Ohio.  Carol Sposit is the wife of Donal Sposit and is the executor of his estate, having been appointed same in the Cuyahoga County Probate Court in Case No. 2010 EST0160085.

22.   Plaintiff, Dennis Wade, (hereinafter "Wade")  at all times relevant herein, is a resident of Thompson, Geauga County, Ohio.

23.   Plaintiff, Denise Wade, at all times relevant herein, is a resident of Thompson, Geauga County, Ohio.  Denise Wade is the wife of Dennis Wade.

24.   Plaintiff, Fred Williams, Jr., (hereinafter "Williams") at all times relevant herein was a resident of Mansfield, Richland County, Ohio.

25.    Plaintiff, Michelle Dabney (hereinafter "Dabney") at all times relevant herein was a resident of Cincinnati, Hamilton County, Ohio.

26.   Plaintiff Linda Julious, (hereinafter "Julious")  at all times relevant herein is a resident of Kenton County, Kentucky.

27.     Plaintiff, Constance Powell, (hereinafter "Powell")  at all times relevant herein is a resident of Cincinnati, Hamilton County, Ohio.

28.     Plaintiff, Reginald Evans, (hereinafter "Evans")  at all times relevant herein is a resident of Cleveland, Cuyahoga County, Ohio.

29.     Plaintiff, Brian Ferguson (hereinafter "Ferguson") at all times relevant herein was a resident of Columbus, Franklin County, Ohio.

30.     Plaintiff Joseph Lackay, (hereinafter "Lackay")  at all times relevant herein is a resident of Pickerington, Franklin County, Ohio.

31.     Plaintiff Shelly Matthew (hereinafter "Matthew") at all times relevant herein was a resident of Gallipolis, Gallia County, Ohio.

32.     Plaintiff, Laura McNeal (hereinafter "McNeal") at all times relevant herein was a resident of Leesburg, Kosciusko County, Indiana.

33.     Plaintiff Kimball Pettiford, (hereinafter "Pettiford")  at all times relevant herein is a resident of Washington Courthouse, Fayette County, Ohio.

34.     Plaintiff, Justice Abraham (hereinafter "Abraham") at all times relevant herein was a resident of Columbus, Franklin County, Ohio.

35.     Plaintiff, Raymond Barkheimer (hereinafter "Barkheimer") at all times relevant herein was a resident of Dover, Tuscarawas County, Ohio.

36.      Plaintiff, Donal Bentley (hereinafter "Bentley") at all times relevant herein was a resident of Dunkin Springs, Highland County, Ohio.

37.     Plaintiff, Robert Bobo (hereinafter "Bobo") at all times relevant herein was a resident of Columbus, Franklin County, Ohio.

38.    Plaintiff, Melissa Cheresnick (hereinafter "Cheresnick") at all times relevant herein was a resident of Pearcy, Garland County, Arkansas.

39.    Plaintiff, Debra Cline (hereinafter "Cline") at all times relevant herein is a resident of Portsmouth, Scioto County, Ohio.

40.    Plaintiff, Dawson Coker, (hereinafter "Coker") at all times relevant herein is a resident of Toledo, Lucas County, Ohio.

41.    Plaintiff, Patricia Coker, at all times relevant herein is a resident of Toledo, Lucas County, Ohio.  Patricia Coker is the wife of Dawson Coker.

42.     Plaintiff Jennifer Coleman (hereinafter "Coleman") at all times relevant herein was a resident of Dayton, Montgomery County, Ohio.

43.    Plaintiff, Annette Courtney (hereinafter "Courtney") at all times relevant herein is a resident of Findlay, Hancock County, Ohio.

44.    Plaintiff William Cox (hereinafter "Cox")  at all times relevant herein was a resident of Monroe County, Michigan.

45.    Plaintiff, Ruth Cronk (hereinafter "Cronk") at all times relevant herein is a resident of Mount Juliet, Wilson County, Tennessee.

46.    Plaintiff, Jack Cronk, at all times relevant herein is a resident of Mount Juliet, Wilson County, Tennessee.  Jack Cronk is the husband of Ruth Cronk.

47.     Plaintiff, Charles Denny (hereinafter "Denny") at all times relevant herein was a resident of Florence, Boone County, Kentucky.

48.     Plaintiff Carmita Foster (hereinafter "Foster") at all times relevant herein is a resident of Columbus, Franklin County, Ohio.

49.     Plaintiff Larry Graham (hereinafter "Graham") at all times relevant herein was a resident of Columbus, Franklin County, Ohio.

50.     Plaintiff Arthur Greene (hereinafter "Greene") at all times relevant herein was a resident of Toledo, Lucas County, Ohio.

51.     Plaintiff Nathaniel Griffith, (hereinafter "Griffith") at all times relevant herein, was a resident of Cincinnati, Hamilton County, Ohio.

52.     Plaintiff, Lori Barber Griffith, at all times relevant herein was a resident of Cincinnati, Montgomery County, Ohio. Lori Barber Griffith is the wife of Nathaniel Griffith.

53.     Plaintiff, Aralla Harrington (hereinafter "Harrington") at all times relevant herein was a resident of Xenia, Greene County, Ohio.

54.     Plaintiff, Gregg Hartsock (hereinafter "Hartsock") at all times relevant herein was a resident of Hamilton, Butler County, Ohio.

55.     Plaintiff Ernie Hasty, ("hereinafter Hasty") at all times relevant herein is a resident of Kettering, Montgomery County, Ohio.

56.     Plaintiff Mary Hasty at all times relevant herein is a resident of Kettering, Montgomery County, Ohio. Mary Hasty is the wife of Ernie Hasty.

57.     Plaintiff Cecelia Hill, (hereinafter "Hill") at all times relevant herein was a resident of Toledo, Lucas County, Ohio.

58.     Plaintiff, Jacqueline Hoke (hereinafter "Hoke") at all times relevant herein was a resident of South Charleston, Clark County, Ohio.

59. Plaintiff, James Hoke at all times relevant herein was a resident of South Charleston, Clark County, Ohio. James Hoke is the husband of Jacqueline Hoke.

60. Plaintiff, Carolyn Hudgins (hereinafter "Hudgins") at all times relevant herein was a resident of Columbus, Franklin County, Ohio.

61. Plaintiff Allison Johnson (hereinafter "A. Johnson") at all times relevant herein is a resident of Dayton, Montgomery County, Ohio.

62. Plaintiff, Brenda Johnson (hereinafter "B. Johnson") at all times relevant herein was a resident of Cincinnati, Hamilton County, Ohio.

63. Plaintiff, Walter Kirkbride, (hereinafter "Kirkbride") at all times relevant herein is a resident of Zanesville, Muskingum County, Ohio. Walter Kirkbride died on May 3, 2012. Tina Kirkbride Beach is the executor of his estate.

64. Plaintiff, Mary Kirkbride, at all times relevant herein is a resident of Zanesville, Muskingum County, Ohio. Mary Kirkbride is the wife of Walter Kirkbride.

65. Plaintiff Larry Kratzer (hereinafter "Kratzer") at all times relevant herein is a resident of Orrville, Wayne County, Ohio.

66. Plaintiff Rebecca Kratzer at all times relevant herein is a resident of Orrville, Wayne County, Ohio. Rebecca Kratzer is the wife of Larry Kratzer.

67. Plaintiff, Carmen Looney (hereinafter "Looney") at all times relevant herein is a resident of St. Albans, Kanawha County, Tennessee.

68. Plaintiff, Robert Moody, (hereinafter "Moody") at all times relevant herein is a resident of Warren, Trumbull County, Ohio.

69. Plaintiff, Kathy Moody, is a resident of Warren, Trumbull County, Ohio. Kathy Moody is the wife of Robert Moody.

70. Plaintiff, Christel Murdocco (hereinafter "Murdocco") at all times relevant herein was a resident of Navarre, Stark County, Ohio.

71. Plaintiff Mark Murdocco at all times relevant herein was a resident of Navarre, Stark County, Ohio. Marc Murdocco is the husband of Christel Murdocco.

72. Plaintiff Ralph Napolitano, (hereinafter "Napolitano") at all times relevant herein, is a resident of Blacklick, Franklin County, Ohio.

73. Plaintiff Emily Napolitano, at all times relevant herein, is a resident of Blacklick, Franklin County, Ohio. Emily Napolitano is the wife of Ralph Napolitano.

74. Plaintiff, Tracy Neal (hereinafter "Neal") at all times relevant herein was a resident of Franklin County, Ohio. Plaintiff Neal is currently a resident of Colorado Springs, Colorado.

75. Plaintiff, Danny Neal, at all times relevant herein was a resident of Franklin County, Ohio. Danny Neal is the husband of Tracy Neal.

76. Plaintiff, Greg Patton (hereinafter "Patton") at all times relevant herein was a resident of Cincinnati, Hamilton County, Ohio.

77. Plaintiff, Crystal Phipps (hereinafter "Phipps") at all times relevant herein was a resident of Louisville, Stark County, Ohio.

78. Plaintiff, Meridith Ricketts (hereinafter "Ricketts") at all times relevant herein was a resident of Toledo, Lucas County, Ohio.

79.   Plaintiff, Ina Riffe (hereinafter "Riffe") at all times relevant herein was a resident of Monroe, Butler County, Ohio.

80.   Plaintiff, Catherine Science (hereinafter "Science") at all times relevant herein was a resident of Springfield, Clark County, Ohio.

81.   Plaintiff, Amy Steinmetz, (hereinafter "Steinmetz") at all times relevant herein is a resident of Batavia, Hamilton County, Ohio.

82.   Plaintiff, Kristy Watts (hereinafter "Watts") was a resident of Middletown, Butler County, Ohio.

83.   Plaintiff, Mike Winners, (hereinafter "Winners")  at all times relevant herein was a resident of Defiance, Defiance County, Ohio.

84.   Plaintiff Diane Winners, at all times relevant herein was a resident of Defiance, Defiance County, Ohio.  Diane Winners is the wife of Mike Winners.

85.   Defendant Intuitive Surgical, Inc. (hereinafter "Intuitive") is a corporation organized under the laws of the State of California, duly registered with the Ohio Secretary of State as doing business in the State of Ohio.  At all times relevant, Intuitive was engaged in the business of developing, testing, and selling surgical equipment in the State of Ohio.

86.   Defendant Cleveland Clinic Foundation (hereinafter "CCF") is an Ohio corporation and a duly licensed hospital and/or clinic under the laws of the State of Ohio. Defendant CCF, through its agent(s), servant(s), and employee(s) was responsible for rendering appropriate care and treatment to the hereinafter named Plaintiffs on or about the dates as set forth in this Complaint.

87.   Defendant Delos Cosgrove, M.D. (hereinafter "Cosgrove") is CCF's Chief Executive Officer.  As CCF's Chief Executive Officer, Cosgrove is, and was at all times relevant herein, responsible for ensuring the CCF created, implemented, enforced, and applied policies for all of CCF's operations and activities that complied with both applicable professional standards of care.

88.   Defendant Jihad Kaouk, M.D. (hereinafter "Kaouk") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

89.   Defendant Raj Goel, M.D. (hereinafter "Goel") at all times pertinent hereto was physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

90.   Defendant John Zhao (hereinafter "Zhao") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice or urology in Cleveland, Cuyahoga County, Ohio.

91.   Defendant Indibar Gil, M.D. (hereinafter "Gil") at all times relevant hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

92.   Defendant Jason Hafron, M.D. (hereinafter "Hafron") at all times relevant hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

93.     Defendant John Kefer, M.D. (hereinafter "Kefer") was at all times relevant was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

94.     Defendant Nicholas Hegarty (hereinafter "Hegarty") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

95.     Defendant Una Lee, M.D. (hereinafter "Lee") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

96.     Defendant White Wesley Matthew, M.D. (hereinafter "Matthew) at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

97.     Defendant Andrew Stephenson, M.D. (hereinafter "Stephenson") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

98.     Defendant Hadley Wood, M.D. (hereinafter "Wood") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

99.     Defendant Carvell Nguyen, M.D., M.D. (hereinafter "Nguyen") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

100. Defendant Christopher Weight, M.D. (hereinafter "Weight") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

101. Defendant Vairavan Subramanian, M.D. (hereinafter "Subramanian") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

102. Defendant Monis Aron (hereinafter "Aron") at all times pertienent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice or urology in Cleveland, Cuyahoga County, Ohio.

103. Defendant Kevin El-Hayek, M.D. (hereinafter "El-Hayek") at all times pertinent hereto was a physician licensed to practice medicine in the State of Ohio engaged in the practice of urology in Cleveland, Cuyahoga County, Ohio.

104. Defendant, J. Michael Henderson, M.D. (hereinafter "Henderson") at all times pertinent hereto was the chief quality officer of the Cleveland Clinic Health System, which is CCF's parent company. As Chief Quality Officer, Henderson at a duty to insure all surgeons were credentialed, privileged, and acting within their scope of privileging.

105. The aforementioned Defendants Cosgrove, Kaouk, Goel, Zhao, Gil, Hafron, Kefer, Hegarty, Lee, Matthew, Stephenson, Wood, Nguyen, Weight, Subramanian, Arnon, El-Hayek and Henderson at all times pertinent hereto were agents, assigns, and/or employees of Defendant CCF.

28

106.    Defendants, Medicare Secondary Payer Recovery Contractor, Anthem Blue Cross and Blue Shield, Ohio Department of Job and Family Services, and United Health Care, (hereinafter "insurance carriers") are corporations in Ohio or licensed to do business in Ohio. Defendant insurance carriers have provided health insurance benefits to Plaintiffs in connection with the treatment of injuries suffered as a result of the actions of the other named Defendants. There is a genuine dispute with the insurance carriers with regards to the existence and/or extent of the insurance carriers' subrogation rights for health benefits paid on Plaintiffs' behalf in connection with these injuries.

## FACTS

107.    Plaintiffs incorporate all allegations in the previous paragraphs of this Complaint by reference as if fully rewritten herein.

**(Cleveland Clinic Plaintiffs)[1]**

    A.    <u>Lindgren Chi</u>

108.    On or about January 22, 2007 Plaintiff Chyi underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic performed by Defendants Kaouk and Hafron.

109.    Defendants Kaouk and Hafron performed Chyi's robotic prostatectomy with the da Vinci robot to remove invasive adenocarcinoma from his prostate.

---

[1] The Cleveland Clinic Plaintiffs have brought separate causes of action for medical negligence and other claims hereinafter, along with the claims against Defendant Intuitive, which are included. These claims are like and similar to those brought by Plaintiff, David Antoon in Case No. 3:12-cv-027 in the United States Federal District Court for the Southern District of Ohio, in separate filings, which may be subject to joinder hereafter. A motion will be made.

110. Plaintiff Chyi had no pre-existing conditions including sexual dysfunction or urinary incontinence and other than his prostate cancer, was healthy.

111. Defendant Kaouk represented to Chyi that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence. Kaouk stated the latter two (potency and continence) were almost as important as the first (removal of the cancer)

112. Defendant Kaouk advised Chyi that a robotic prostatectomy was the best treatment option because it was more accurate and was safer. In addition to removing the cancer, Defendant Kaouk stated that the robotic prostatectomy had equal or better outcomes for retaining potency and continence when compared to open belly surgery.

113. Defendant Kaouk guaranteed Chyi that he would perform Chyi's surgery

114. Plaintiff Chyi was unaware that Defendants Kaouck or Hafron may not have been qualified, certified, or credentialed to perform Chyi's robotic prostatectomy or to use the da Vinci.

115. Plaintiff Chyi does not recall seeing Defendant Kaouk before or after his surgery.

116. Plaintiff Chyi was not aware that the da Vinci was defective.

117. Plaintiff Chyi was not aware that unqualified doctors and/or the defective da Vinci device caused his surgical injuries or adverse events.

118. After his robotic prostatectomy, Chyi was completely impotent and incontinent.

119. Plaintiff Chyi first discovered that his injuries may be related to medical negligence on or about September 15, 2013.

30

120. Plaintiff Chyi first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

B. Edmund Eisnaugle

121. On or about January or February, 2007 Plaintiff Eisnaugle underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic performed by Defendants Kaouk, Aron, and El-Hayek.

122. Defendants Kaouk, Monish, and El-Hayek performed Eisnaugle's robotic prostatectomy with the da Vinci robot to remove invasive adenocarcinoma from his prostate.

123. Plaintiff Eisnaugle had no pre-existing conditions including sexual dysfunction or urinary incontinence and other than his prostate cancer, was healthy.

124. Defendant Kaouk represented to Eisnaugle that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence.  Kaouk stated the latter two (potency and continence) were almost as important as the first (removal of the cancer)

125. Defendant Kaouk advised Eisnaugle that a robotic prostatectomy was the best treatment option because it was more accurate and was safer.  In addition to removing the cancer, Defendant Kaouk stated that the robotic prostatectomy had equal or better outcomes for retaining potency and continence when compared to open belly surgery.

31

126. Plaintiff Eisnaugle was unaware that Defendants Kaouk, Monish, and El-Hayek may not have been qualified, certified, or credentialed to perform Eisnaugle's robotic prostatectomy or to use the da Vinci.

127. Plaintiff Eisnaugle was not aware that the da Vinci was defective.

128. Plaintiff Eisnaugle was not aware that unqualified doctors and/or the defective da Vinci device caused his surgical injuries or adverse events.

129. After his robotic prostatectomy, Eisnaugle was completely impotent and incontinent.

130. Plaintiff Eisnaugle first discovered that his injuries may be related to medical negligence on or about March 18, 2013.

131. Plaintiff Eisnaugle first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

    C. <u>Mark Fulmer</u>

132. On or about March 2008 Plaintiff Fulmer underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic by Defendant Gill.

133. Defendant Gill performed Fulmer's robotic prostatectomy with the da Vinci robot to remove invasive adenocarcinoma from his prostate.

134. Plaintiff Fulmer had no pre-existing conditions including sexual dysfunction or urinary incontinence and other than his prostate cancer, was healthy.

135. Defendants represented to Fulmer that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence.

Defendants stated the latter two (potency and continence) were almost as important as the first (removal of the cancer)

136. Defendants advised Fulmer that a robotic prostatectomy was the best treatment option because it was more accurate and was safer. In addition to removing the cancer, Defendants stated that the robotic prostatectomy had equal or better outcomes for retaining potency and continence when compared to open belly surgery.

137. Plaintiff Fulmer was unaware that Defendants may not have been qualified, certified, or credentialed to perform Fulmer's robotic prostatectomy or to use the da Vinci.

138. Plaintiff Fulmer was not aware that the da Vinci was defective.

139. Plaintiff Fulmer was not aware that unqualified doctors and/or the defective da Vinci device caused his surgical injuries or adverse events.

140. After his robotic prostatectomy, Fulmer was completely impotent and incontinent.

141. Plaintiff Fulmer first discovered that his injuries may be related to medical negligence on or about March 18, 2013.

142. Plaintiff Fulmer first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

   D. David Gagliano[2]

_____

[2] The claims by Plaintiff Gagliano are only against Intuitive and do not include any medical negligence claims.

143. Defendant Gagliano was born on May 3, 1945 and was sixty two (62) years old when he underwent a robotic prostatectomy at CCF on March 5, 2007.

144. On or about March 5, 2007 Plaintiff Gagliano underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic by Defendants Kaouk and Hafron.

145. Plaintiff Gagliano was unaware that the da Vinci was defective.

146. Plaintiff Gagliano first discovered that his injuries were a proximate result of the da Vinci robot on or about March 5, 2013. Gagliano had previously brought a medical malpractice/negligence claim only in the Cuyahoga County Common Pleas Court in Case No. 707473 but had been unaware of the claims against Intuitive.

E. Michael Mergler

147. Plaintiff Mergler was born on November 11, 1951 and was fifty-four (54) years old when he underwent a robotic prostatectomy at CCF on April 18, 2006.

148. Defendants Kaouk and Hegarty performed Mergler's robotic prostatectomy with the da Vinci to remove invasive adenocarcinoma from his prostate.

149. Prior to undergoing his prostatectomy Mergler suffered from elevated liver enzymes, depress, and anxiety but has no sexual dysfunction or urinary incontinence and was otherwise healthy.

150. Defendant Kaouk represented to Mergler that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence. Defendant Kaouk stated the latter two (potency and continence) were almost as important as the first (removal of cancer).

151. Defendant Kaouk advised Mergler that a robotic prostatectomy was the best treatment option because it was more accurate and was safer. In addition to removing the cancer Defendant Kaouk stated that the robotic prostatectomy had equal or better outcomes for retaining potency and continence when compared to open belly surgery.

152. Defendant Kaouk advised Mergler that his "dry" outcomes were ninety eight percent (98%) and his surgical outcomes for potency were "the best in the country."

153. Defendant Kaouk told Mergler that he was the head robotics at CCF, had performed "hundreds and hundreds" of robotic prostatectomies and was the most experienced surgeon in the country in robotic prostatectomies.

154. Defendant Kaouk guaranteed Mergler that he would perform Mergler's surgery.

155. No informed consent exists or can be found in Mergler's medical records. Additionally, there is no record of any member of the surgical team reviewing patient consent with Mergler the day of surgery.

156. Plaintiff Mergler was unaware that Defendant Kaouk or Hegarty may not have been qualified, certified, or credentialed to perform Mergler's robotic prostatectomy or use the da Vinci.

157. Plaintiff Mergler does not recall seeing Defendant Kaouk before or after surgery.

158. Plaintiff Mergler was unaware that unqualified physicians and/or the defective da Vinci device caused his surgical injuries or adverse events.

159. The Surgical Time-Out does not record Kaouk present during the surgery.

160. Defendant Kaouk's Attestation is completely blank and does not contain his signature.

161. The Operative Note is written in the third person to conceal the surgeon's identity and is unsigned.

162. Defendant Kaouk advised Mergler that he had removed all his cancer during surgery.

163. Defendant Kaouk failed to inform Mergler that his surgical pathology report documented positive cancer margins.

164. Defendant Kaouk did not advise Mergler to begin additional cancer treatments immediately.

165. Plaintiff Mergler was unaware that he still had cancer until 2010 when a routine test revealed extremely elevated PSA levels.  He immediately began chemotherapy treatment.

166. Defendant Kaouk failed to remove the Jackson Pratt drain from Mergler's abdomen following surgery.  After several weeks, Mergler called Kaouk's office, that was unaware the drain had not been removed.

167. After his robotic prostatectomy Mergler was completely impotent and incontinent.

168. Mergler first discovered that his injuries may be related to medical negligence on or about September 15, 2012.

169. Plaintiff Mergler first learned that his injuries were a proximate result of the da Vinci robot on or about March 5, 2013.

F. <u>John Perrotti</u>

170.   Plaintiff Perrotti was born on November 28, 1936 and was seventy-one (71) years old when he underwent a robotic prostatectomy on November 19, 2008.

171.   On or about November 18, 2008 Plaintiff Perrotti underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic by Defendants Kaouk, Matthew, and Lee.

172.   Defendant Kaouk represented to Perrotti that the three main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence.  Defendant Kaouk advised Perrotti that the latter two (potency and continence were almost as important as the first (removal of cancer).

173.   The only treatment option Defendant Kaouk offered to Perrotti was a robotic prostatectomy.  Kaouk never advised Perrotti of other treatment options such as open belly surgery or radiation.  Instead Defendant Kaouk told Perrotti that robotic prostatectomies were the "gold standard" and that very soon all surgeries would be performed robotically.

174.   Defendant Kaouk advised Perrotti that robotic surgery had equal or better outcome for retaining potency and continence when compared to open belly surgery.

175.   Defendant Kaouk advised Perrotti that he would be continent within a few weeks and potent within six to eight months following surgery.

176.   Defendant Kaouk did not advise Perrotti of any potential complications of surgery.

177. Defendant Kaouk advised Perrotti that he was the head of robotics at CCF and the most experience surgeon in the entire country for robotic prostatectomies.

178. Defendant Kaouk guaranteed Perrotti that he would perform Perrotti's surgery from "A to Z."

179. When being moved into the operating room Plaintiff Perrotti asked the resident about Defendant Kaouk's location and told the resident he had only authorized Kaouk to perform the surgery. The resident replied "The boss will be here in a while."

180. No informed consent was obtained from Plaintiff Perrotti and the medical record does not note any member of the surgical team reviewing patient consent with Perrotti the day of surgery.

181. Plaintiff Perrotti was not aware that Defendants, Kaouk, Lee or Matthew may not have been qualified, certified, or credentialed to perform Perrotti's robotic prostatectomy or use the da Vinci.

182. Plaintiff Perrotti does not recall seeing Defendant Kaouk before or after surgery.

183. Plaintiff Perotti was not aware that the da Vinci was defective.

184. Plaintiff Perrotti was not aware than unqualified physicians and/or the defective da Vinci device caused his surgical injuries or adverse events.

185. The Surgical Time-Out does not record Defendant Kaouk present during the surgery.

186. Defendant Kaouk's attestation is completely blank and does not contain his signature.

187. The Operative Note was written in the third person to conceal the surgeon's identity and is unsigned.

188. On November 26, 2008, Plaintiff Perrotti presented for a follow up visit at which time a cystogram that revealed an anastomotic leak.  Perrotti hand carried the cystogram results to Defendant Kaouk.  Kaouk's assistant wrote in Perrotti's medical records "Cystogram:  No leak."

189. Neither Defendant Kaouk or any other staff surgeon co-signed the note written as required for Medicare reimbursement.

190. When Plaintiff Perrotti became concerned about his continued incontinence and impotence he called Defendant Kaouk.  Kaouk never returned any of Perrotti's phone calls and never informed Perrotti that he had been permanently rendered impotent and incontinent.

191. On June 23, 2010, Perrotti sent a letter to Defendant Kaouk describing his extremely negative outcome from the surgery.  Defendant Kauok never responded to the letter.

192. In October 2010, Perrotti consulted with a board certified urologist who informed Perrotti that his incontinence was a result of surgical damage and missing tissue from his robotic prostatectomy.

193. Following his robotic prostatectomy, Plaintiff Perrotti was completely impotent and incontinent.

194. Plaintiff Perrotti was required to undergo reconstructive surgery to implant a bladder sling in an effort to control his incontinence.

195. Plaintiff Perrotti first discovered that his injuries may be related to medical negligence on or about September 15, 2012.

196. Plaintiff Perrotti first learned this his injuries were a proximate result of the da Vinci robot on or about March 5, 2013.

G. John Razem

197. Plaintiff Razem was born on October 13, 1943 and was sixty-five (65) years old when he underwent a robotic prostatectomy at CCF on April 15, 2009.

198. On or about April 15, 2009 Plaintiff Razem underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic by Defendants Stephenson and Nguyen.

199. Plaintiff suffered from hypertension and heart disease prior to his prostatectomy but had no sexual dysfunction or urinary incontinence and was otherwise healthy.

200. Defendant Stephenson represented to Plaintiff Razem that the three main objectives or a robotic prostatectomy were to remove the cancer, retain potency, and retain continence. Defendant Stephenson advised Plaintiff Razem that the latter two (potency and continence) were almost as important as the first (removal of cancer.)

201. Defendant Stephenson told Plaintiff Razem that surgery was the best treatment option because it removed cancer and that robotic surgery was more accurate and precise.

202. Defendant Stephenson advised Plaintiff Razem that he would be continent within a few weeks and potent within six to eight months.

203. Defendant Stephenson did not discuss any potential complications of surgery with Plaintiff Razem.

204. The medical consent signed by Plaintiff Razem is not contained within the medical records.  Additionally, there is no record of any member of the surgical team reviewing the patient consent with Razem on the day of surgery.

205. Plaintiff Razem was unaware that Defendant Stephenson or any of his residents or fellows may not have been qualified, certified, or credentialed to perform Razem's robotic prostatectomy or use the da Vinci.

206. Plaintiff Razem does not recall seeing Defendant Stephenson before or after surgery.

207. Plaintiff Razem was not aware that the da Vinci was defective.

208. Plaintiff Razem was not aware that unqualified physicians and/or the defective da Vinci device caused his surgical injuries or adverse events.

209. The Surgical Time-Out is missing from Razem's medical records.

210. During the surgical procedure Plaintiff Razem suffered significant complications including injury to his obturator nerve and required at least four (4) units of blood during the surgical procedure.

211. There was no attempt during the surgical procedure to salvage Razem's bladder neck.

212. As a result of complications during surgery, Razem required hospitalization for some twenty-one (21) days.

213. After his robotic prostatectomy Razem was completely impotent and incontinent. Additionally, the damage to his obturator nerve has caused him extreme and permanent pain.

214. An outside agency, KePRO, investigated Plaintiff's medical care and found that Defendant Stephenson did not meet the standard of care. Defendant Stephenson has refused to authorize the release of these findings to Plaintiff Razem.

215. Plaintiff Stephenson first discovered that his injuries may be related to medical negligence on or about September 15, 2013.

216. Plaintiff Razem first discovered that his injuries proximately resulted from the da Vinci robot on or about March 5, 2013.

H.  Donal Sposit

217. Plaintiff Sposit was born on December 13, 1936 and was sixty-eight (68) years old when he underwent a robotic prostatectomy at CCF on November 29, 2005 by Defendants Kaouk, Hegarty, and Wood.

218. Plaintiff Sposit had no pre-existing conditions, sexual dysfunction, or urinary incontinence before his prostatectomy and other than prostate cancer, was otherwise healthy.

219. Defendant Kaouk represented that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency and retain continence. Defendant Kaouk stated that the latter two (potency and continence) were almost as important as the first (removal of cancer.)

220.  Defendant Kaouk advised Plaintiff Sposit that a robotic prostatectomy was the best option because it was more accurate and safer.  Defendant Kaouk advised Plaintiff Sposit that the robotic prostatectomy had equal or better outcomes for retaining potency and continence when compared to open belly surgery.

221.  Defendant Kaouk advised Plaintiff Sposit that his "dry" outcomes were ninety eight percent (98%) and that Sposit would not suffer any impotence.

222.  Defendant Kaouk did not discuss the potential complications of surgery with Sposit.

223.  Defendant Kaouk guaranteed Sposit that he would perform his surgery.

224.  Plaintiff Sposit was unaware that Defendant Kaouk, Hegarty, or Wood may not have been qualified, certified, or credentialed to perform Sposit's robotic prostatectomy or use the da Vinci.

225.  Plaintiff Sposit was unaware the da Vinci was defective.

226.  Plaintiff Sposit was unaware that unqualified physicians and/or the defective da Vinci device caused his surgical injuries or adverse events.

227.  After his robotic prostatectomy, Plaintiff Sposit was completely impotent and incontinent until his death in August 2010.

228.   Plaintiff, Estate of Donal Sposit first discovered that his injuries may have been related to medical negligence on or about September 15, 2012.

229.  Plaintiff, Estate of Donal Sposit first discovered that his injuries may have proximately resulted from the da Vinci robot on or about March 5, 2013.

I.  Dennis Wade

230.   Plaintiff Wade was born on February 25, 1948 and was fifty-nine (59) years old when he underwent a robotic prostatectomy at CCF on February 18, 2008.

231.   Defendants Kaouk and Goel performed Wade's robotic prostatectomy with the da Vinci to remove invasive adenocarcinoma confined to the prostate.

232.   Plaintiff Wade suffered from hypertension and heart disease prior to his prostatectomy but had no sexual dysfunction or urinary incontinence and was otherwise healthy.

233.   Defendant Kaouk represented that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence. Defendant Kaouk stated the latter two (potency and continence ) were almost as important as the first (removal of cancer.)

234.   Defendant Kaouk offered a robotic prostatectomy as the only treatment option to Plaintiff Wade.  Defendant Kaouk never mentioned open belly surgery or radiation as treatment options.  Defendant Kaouk advised Wade that robotic prostatectomies were the "gold standard" and that  very soon all surgeries would be done robotically.

235.   Defendant Kaouk advised Wade that he would be "dry" within a few weeks and that Kaouk's success rate for continence was 98%.  Defendant Kaouk advised Wade that with a specific "nerve sparing" technique during the robotic prostatectomy, his potency success rate was 98%.

236.   Defendant Kaouk advised Plaintiff Wade that he had performed six hundred (600) robotic prostatectomies.

237. Defendant Kaouk never discussed the potential complications of surgery with Wade.

238. Defendant Kaouk guaranteed Wade that only Defendant Kaouk would perform Wade's surgery and they "shook on it." In reliance of Kauok's guarantee, Wade signed an informed consent.

239. The notes from Wade's same day surgical consent review are completely blank with the exception of Defendant Kaouk's signature dated March 24, 2008, well over a month after Wade's surgery.

240. Plaintiff Wade was not aware that Defendant Kaouk or Goel may not have been qualified, certified, or credentialed to perform Wade's robotic prostatectomy or use the da Vinci.

241. Plaintiff Wade was not aware that the da Vinci was defective.

242. Plaintiff Wade was not aware that unqualified physicians and/or the defective da Vinci device caused his surgical injuries or adverse events.

243. The Surgical Time-Out indicates that Defendant Goel was the only surgeon present during the surgery and does not indicate that Defendant Kaouk was present.

244. Defendant Kaouk's attestation is completely blank and does not contain his signature.

245. The Operative Note is written in the third person to conceal the surgeon's identity and is unsigned.

246. In December 2008 a board certified urologist informed Wade that his "urethral sphincter was sliced in half like a bagel." This caused Wade's incontinence as a result of surgical damage and missing tissue from his robotic prostatectomy at CCF.

247. In January 2009, Plaintiff Wade was required to undergo reconstructive surgery to implant an artificial urethral sphincter to control his incontinence.

248. Following his robotic prostatectomy, Plaintiff Wade was completely impotent and incontinent.

249. Plaintiff Wade first became aware that his injuries may have been the result of medical negligence and related claims on or about September 15, 2012.

250. Plaintiff Wade first became aware that his injuries may have been proximately related to the da Vinci robot on March 5, 2013.

J.  Fred Williams, Jr.

251. Plaintiff Williams was born on November 14, 1949 and was sixty-one (61) years old when he underwent a robotic prostatectomy at CCF in December 2010.

252. Defendants Kaouk, Weight, and Subramanian performed Williams' robotic prostatectomy with the da Vinci to remove invasive adenocarcinoma.

253. Prior to surgery Williams suffered from hypertension and depression but had no sexual dysfunction or urinary incontinence and was otherwise healthy.

254. Defendant Kaouk represented that the three (3) main objectives of a robotic prostatectomy were to remove the cancer, retain potency, and retain continence.

Defendant Kaouk stated the latter two (potency and continence) were almost as important as the first (removal of cancer).

255. Defendant Kaouk only offered a robotic prostatectomy as a treatment option to Williams.  Defendant Kaouk never mentioned open belly surgery or radiation as treatment options.  Defendant Kaouk told Williams that robotic prostatectomies were the "gold standard" and that very son all surgeries would be done robotically.

256. Defendant Kaouk told what that he would be "dry" within a few weeks and that his success rate for continence was 98%.  Defendant Kaouk also advised Wade that with the specific "nerve sparing" technique during the robotic prostatectomy, his potency success rate was 98%.

257. Defendant Kaouk did not discuss the potential complications of surgery with Williams.

258. Defendant Kaouk guaranteed Williams that he would perform Williams' surgery. In reliance on this guarantee, Williams signed the informed consent.

259. Williams was not aware that Defendants Kaouk, Wegith, or Subramanian may not have been qualified, certified, or credentialed to perform Williams' robotic prostatectomy or use the da Vinci.

260. Williams never saw Defendant Kaouk before or after surgery.  Williams did, however, see a woman and the woman that Williams saw performed his surgery.

261. Williams was not aware the da Vinci was defective.

262.    Williams was not aware that unqualified physicians and/or the da Vinci device caused his surgical injuries or other adverse events.

263.    After his robotic surgery, Plaintiff Williams was completely impotent and incontinent.

264.    Plaintiff Williams was required to undergo reconstructive surgery to implant an AUS to control his continence.  Unfortunately, this surgery did not provide Williams with any positive results and Williams continues to suffer constant pain.

265.    Plaintiff Williams also underwent an additional reconstructive surgery to place an artificial penile implant to control his impotence which also failed.

266.    As a result of his continued sexual dysfunction, incontinence and depression, Williams' wife divorced him.

267.    Plaintiff Williams contemplated suicide and purchased a gun.  During an altercation with a friend, the gun accidentally discharged and injured his friend and as a result Williams was, and still is, incarcerated.

268.    Plaintiff Williams first became aware his injuries may have been related to medical negligence on or about March 18, 2013.

269.    Plaintiff Williams first became aware that his injuries were proximately related to the da Vinci robot until March 18, 2013.

## Court of Claims Plaintiffs[3]

---

[3] The Court of Claims Plaintiffs have brought separate claims for medical negligence and related causes of action in the Ohio Court of Claims and also have named Intuitive as a Defendant in the Court of claims as a necessary party. See R.C. 2743.02.  A case for each of the Plaintiffs treated in a State institution will shortly be filed.

270.    On or about February 16, 2013 Plaintiff Dabney underwent a da Vinci robot assisted hysterectomy at University Medical Center in Cincinnati, Ohio by Dr. Hirth.

271.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Dabney suffered injuries and damages.

272.    On or about February 27, 2013 Plaintiff Linda Julious underwent a da Vinci robot assisted hysterectomy at University Hospital in Cincinnati, Ohio by Brian Miller, M.D.

273.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Julious suffered injuries and damages.

274.    On or about May 2, 2013 Plaintiff Powell underwent a da Vinci robot assisted hysterectomy at University of Cincinnati Medical Center by Ronald Hirth, M.D.

275.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Powell suffered injuries and damages.

276.    On or about April 12, 2011 Plaintiff Evans underwent a da Vinci robot assisted prostatectomy at University Hospital in Cincinnati, Ohio by Rabii Madi, M.D.

277.    Plaintiff Evans first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

278.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Evans suffered urinary incontinence and/or erectile dysfunction.

279.  On or about January 11, 2011 Plaintiff Ferguson underwent a da Vinci robot assisted prostatectomy at Ohio State University Medical Center by Dr. Ronnie Abaza.

280.  Plaintiff Ferguson first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

281.  As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Ferguson suffered urinary incontinence and/or erectile dysfunction.

282.  On or about May 1, 2011 Plaintiff Lackay underwent a da Vinci robot assisted prostatectomy at Ohio State Medical Center by Asif Qasi, M.D.

283.  Plaintiff Lackay first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

284.  As a direct and proximate result of the defective robots, its improper and/or unlawful use of the robotic, Plaintiff Lackay suffered urinary incontinence and erectile dysfunction.

285.  On or about July 13, 2012 Plaintiff Matthew underwent a da Vinci robot assisted surgery at Ohio State University in Columbus, Ohio by a physician whose name is not known but shall be ascertained through discovery.

286.  Plaintiff Matthew first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

287.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Matthew suffered a perforated bowel and damages therefrom.

288.   On or about January 7, 2011 Plaintiff McNeal underwent a da Vinci robot assisted hysterectomy at Ohio State Medical Center by Erick Eisenhauer, M.D.

289.   Plaintiff McNeal first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

290.   As a direct and proximate result of the defective, robot,  its improper and/or unlawful use of the robotic, Plaintiff McNeal suffered injuries and damages.

291.   Plaintiff Pettiford underwent a da Vinci robot assisted prostatectomy at Ohio State Medical Center by Dr. Bach.

292.   Plaintiff Pettiford first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

293.   As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic Plaintiff Pettiford suffered urinary incontinence and erectile dysfunction.

**Other Plaintiffs**

294.   On or about September 2010 Plaintiff Abraham underwent a da Vinci robot assisted prostatectomy by Geoffrey Box, M.D. at the Ohio State University Medical Center.

295.   Plaintiff Abraham discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

296.  As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Abraham suffered injury to his bladder and/or other organs resulting in urinary incontinence and erectile dysfunction.

297.  On or about July 2010 Plaintiff Barkheimer underwent a da Vinci robot assisted prostatectomy at Mercy Hospital in Canton, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

298.  Plaintiff Barkheimer discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

299.  As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Barkheimer suffered injuries and damages resulting in urinary incontinence and/or erectile dysfunction.

300.  On or about May 15, 2009 Plaintiff Bentley underwent a da Vinci robot assisted prostatectomy at Bethesda North Hospital in Cincinnati, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

301.  Plaintiff Bentley discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

302.  As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Bentley suffered injuries and damages resulting in urinary incontinence and/or erectile dysfunction.

303.  Plaintiff Bobo underwent a da Vinci robot assisted prostatectomy at Ohio State University Medical Center by a physician whose name is not known at this time but shall be ascertained during discovery.

304. Plaintiff Bobo discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

305. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Bobo suffered injuries and damages resulting in urinary incontinence and/or erectile dysfunction.

306. Plaintiff Cheresnick underwent a da Vinci robot assisted hysterectomy at St. Joe's Mercy Hospital in Arkansas in 2009 by a physician whose name is not known at this time but shall be ascertained during discovery.

307. Plaintiff Cheresnick first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

308. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Cheresnick suffered injuries and damages.

309. On or about August 28, 2012 Plaintiff Cline underwent a da Vinci robot assisted hysterectomy at Kings Daughters Hospital in Ashland, Kentucky by Navita Modi M.D.

310. Plaintiff Cline first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.[4]

311. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Cline suffered injuries to her bladder and ureter.

---

[4] Plaintiff Cline has filed a separate suit in the Scioto County Common Pleas Court in Case No. 13CIA00011 for medical negligence and related claims. Intuitive is named as a party in that suit for purpose of joinder, statute of limitations, and other reasons

312.   On or about October 2, 2008 Plaintiff Coker underwent a da Vinci robot assisted prostatectomy at St. Luke's Hospital in Toledo, Ohio by Eric Pizza, M.D.

313.   Plaintiff Coker first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

314.   As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Coker suffered urinary incontinence and erectile dysfunction.

315.   On or about November 2010 Plaintiff Coleman underwent a da Vinci robot assisted hysterectomy at Miami Valley Hospital in Dayton, Ohio by a physician whose name is unknown but shall be ascertained during discovery.

316.   Plaintiff Coleman first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

317.   As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Coleman suffered injuries and damages.

318.   On or about January 2008 Plaintiff Cox underwent a da Vinci robot assisted prostatectomy at St. Vincent's Medical Center in Toledo, Ohio performed by Mirza Baig, M.D.

319.   Plaintiff Cox first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

320.   As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Cox suffered urinary incontinence and erectile dysfunction.

321.    On or about July 2011 Plaintiff Courtney underwent a da Vinci robot assisted hysterectomy at Blanchard Valley Hospital in Findlay, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

322.    Plaintiff Courtney first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

323.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Courtney suffered injuries and damages.

324.    On or about December 12, 2012 Plaintiff Cronk underwent a da Vinci robot assisted repair of a paraesophageal hernia at Summit Medical Center in Hermitage, Tennessee by John Boskind, M.D.[5]

325.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Cronk suffered an esophageal rupture resulting in injuries and damages.

326.    Plaintiff Denny underwent a da Vinci robot assisted prostatectomy at Good Samaritan Hospital in Cincinnati, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

327.    Plaintiff Denny first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

328.    As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Denny suffered injuries and damages.

---

[5] Plaintiff Cronk may bring a separate lawsuit in State Court in Tennessee for medical negligence and related claims. Intuitive will be named in that suit as well for purposes of joinder. Suite is more proper in the Court at bar for all claims against Intuitive.

329.  On or about April 29, 2006 Plaintiff Dudley underwent a da Vinci robot assisted prostatectomy at St. Vincent's Medical Center in Toledo, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

330.  Plaintiff Dudley first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

331.  As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Dudley suffered injuries and damages.

332.  On or about November 20, 2012, Plaintiff Foster underwent a da Vinci robot assisted hysterectomy at Grant Medical Center in Columbus, Ohio by Tamara Thompson, M.D.[6]

333.  Plaintiff Foster first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

334.  As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Foster suffered a laceration to her bladder resulting injuries and damages.

335.  On or about September 6, 2012 Plaintiff Graham underwent a da Vinci robot assisted surgery at Ohio State University Medical Center.

336.  Plaintiff Graham first discovered that his injuries we a proximate result of th da Vinci robot on or about March 18, 2013.

337.  As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Graham suffered injuries and damages.

---

[6] Plaintiff Foster may  bring a separate lawsuit in the Franklin County, Ohio Common Pleas Court for medical negligence and related claims.  Intuitive will be named in that suit as well for purposes of joinder.

338. On or about March 7, 2012 Plaintiff Greene underwent a da Vinci robot assisted prostatectomy at St. Vincent's Medical Center in Toledo, Ohio by Mirza Baig, M.D[7].

339. Plaintiff Greene first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

340. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Greene suffered urinary incontinence and erectile dysfunction.

341. On or about February 17, 2009 Plaintiff Griffith underwent a da Vinci robot assisted prostatectomy at Good Samaritan Hospital in Cincinnati, Ohio by Emmett O'Neal, M.D.

342. Plaintiff Griffith first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

343. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Griffith suffered urinary incontinence and/or erectile dysfunction.

344. On or about October 4, 2012 Plaintiff Harrington underwent a da Vinci robot assisted hysterectomy at Soin Medical Center in Beavercreek, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

345. Plaintiff Harrington first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

---

[7] Plaintiff Greene may bring a separate lawsuit in the Lucas County, Ohio Common Pleas Court for medical negligence and related claims. Intuitive will be named in that suit as well for purposes of joinder.

346. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Harrington suffered injuries and damages.

347. On or about July 7, 2007 Plaintiff Hartsock underwent a da Vinci robot assisted prostatectomy at University of Cincinnati Medical Center by a physician whose name is not known at this time but shall be ascertained during discovery.

348. Plaintiff Hartsock first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

349. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Hartsock suffered urinary incontinence and/or erectile dysfunction.

350. On or about January 29, 2008 Plaintiff Hasty underwent a da Vinci robot assisted prostatectomy at Kettering Medical Center in Kettering, Ohio by a physician whose name is not known but shall be ascertained during discovery.

351. Plaintiff Hasty first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

352. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Hasty suffered urinary incontinence and/or erectile dysfunction.

353. Plaintiff Hill underwent a da Vinci robot assisted hysterectomy at St. Vincent's Medical Center in Toledo, Ohio by a physician whose name is not know at this time but shall be ascertained through discovery.

354. Plaintiff Hill first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

355. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Hill suffered injuries and damages.

356. On or about April 1, 2013 Plaintiff Hoke underwent a da Vinci robot assisted colposuspension at Miami Valley Hospital in Dayton, Ohio by Debra Miller, M.D.[8]

357. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Hoke suffered a laceration of her iliac vein and suffered injuries and damages therefrom.

358. On or about April 10, 2013 Plaintiff A. Johnson underwent a da Vinci robot assisted hysterectomy at Miami Valley Hospital in Dayton, Ohio by Nancy Romer, M.D.[9]

359. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff A. Johnson suffered injuries to her bladder and damages therefrom.

360. On or about June 10, 2010 Plaintiff B. Johnson underwent a da Vinci robot assisted hysterectomy at The Christ Hospital in Cincinnati, Ohio by Jennifer Green, M.D.

361. Plaintiff B. Johnson first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

---

[8] Plaintiff Hoke may bring a separate suit for medical negligence and related claims in the Montgomery County, Ohio Common Pleas Court. Intuitive will be named in that suit for purposes of joinder.
[9] Plaintiff A. Johnson may bring a separate suit in the Montgomery County, Ohio Common Pleas Court for medical negligence and related claims. Intuitive will be named in that suit for purpose of joinder.

362. As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff B. Johnson suffered an injury to her colon and suffered damages therefrom.

363. On or about April 23, 2012 Plaintiff Kirkbride underwent a da Vinci robot assisted prostatectomy at Good Samaritan Hospital in Zanesville, Ohio by Benjamin Gibson, M.D.

364. Plaintiff Kirkbride first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

365. As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Kirkbride suffered urinary incontinence.

366. On or about April 14, 2008 Plaintiff Kratzer underwent a da Vinci robot assisted prostatectomy at Suma Care Hospital in Akron, Ohio by Dr. Breaux.

367. Plaintiff Kratzer first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

368. As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Kratzer suffered urinary incontinence and erectile dysfunction.

369. On or about June 25, 2012 Plaintiff Looney underwent an adrenelectomy at Thomas Medical Center in South Charleston, West Virginia by John Mani, M.D.[10]

370. Plaintiff Looney first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

---

[10] Plaintiff Looney may  bring a separate suit in West Virginia state court for medical negligence and related claims. Intuitive will be named in that suit for purposes of joinder.

371. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Looney suffered injury to her pancreas resulting in damages therefrom.

372. On or about August 2007 Plaintiff Markland underwent a da Vinci robot assisted hysterectomy at Akron City Hospital in Akron, Ohio by a physician whose name is not known at this time but shall be ascertained through discovery.

373. Plaintiff Markland first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

374. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Markland suffered injuries and damages.

375. On or about February 22, 2010 Plaintiff Moody underwent a da Vinci robot assisted prostatectomy at St. Elizabeth Hospital in Youngstown, Ohio by Daniel Ricchiuti, M.D.

376. Plaintiff Moody first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

377. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Moody suffered urinary incontinence and erectile dysfunction.

378. On or about November 8, 2010 Plaintiff Morris underwent a da Vinci robot assisted surgery at Good Samaritan Hospital in Cincinnati, Ohio by Jack Basil, M.D.

379.  Plaintiff first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

380.  As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Morris suffered injuries and damages.

381.  On or about August 6, 2012 Plaintiff Murdocco underwent a da Vinci robot assisted hysterectomy at Mercy Medical Center in Canton, Ohio by a physician whose name is not known at this time but shall be ascertained through discovery.

382.  Plaintiff Murdocco first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

383.  As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Murdocco suffered injuries and damages.

384.  On or about February 23, 2007 Plaintiff Napolitano underwent a da Vinci robot assisted prostatectomy at Ohio Sated Medical Center in Columbus, Ohio by Dr. Vip Patel and Dr. Steven Clinton.

385.  Plaintiff Napolitano first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

386.  As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Napolitano suffered urinary incontinence and erectile dysfunction.

387.  On or about July 1, 2010 Plaintiff Neal underwent a da Vinci robot assisted hysterectomy at Mt. Carmel West hospital in Columbus, Ohio by Dr. Jaskot.

388. Plaintiff Neal first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

389. As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Neal suffered injuries and damages.

390. On or about August 23, 2011 Plaintiff Patton underwent a da Vinci robot assisted prostatectomy at Bethesda North Hospital in Cincinnati, Ohio by a physician whose name is not known at this time but shall be ascertained during discovery.

391. Plaintiff Patton first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

392. As a direct and proximate result of the defective robot,  its improper and/or unlawful use of the robotic, Plaintiff Patton suffered urinary incontinence and/or erectile dysfunction.

393. On or about January 25, 2013 Plaintiff Phipps underwent a da Vinci robot assisted hysterectomy at Doctor's West Hospital in Columbus, Ohio by a physician whose name is not known at this time but shall be determined during discovery.

394. As a direct and proximate result of the improper and/or unlawful use of the robotic Plaintiff Phipps suffered injuries and damages.

395. On or about October 30, 2008 Plaintiff Ricketts underwent a da Vinci robot assisted prostatectomy at Toledo Hospital in Toledo, Ohio by a physician whose name is not known at this time but shall be ascertained through discovery.

396.   Plaintiff Ricketts first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

397.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Ricketts suffered urinary incontinence and/or erectile dysfunction.

398.   Plaintiff Riffe underwent a da Vinci robot assisted hysterectomy at University of Cincinnati Hospital by a physician whose name is not known at this time but shall be ascertained during discovery.

399.   Plaintiff Riffe first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

400.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Riffe suffered injuries and damages.

401.   On or about September 2009 Plaintiff Science underwent a da Vinci robot assisted hysterectomy at Miami Valley Hospital in Dayton, Ohio by a physician whose name is not known at this time but shall be ascertained through discovery.

402.   Plaintiff Science first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

403.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Science suffered injuries and damages.

404.   On or about July 27, 2012 Plaintiff Smith underwent a da Vinci robot assisted gallbladder surgery at Jewish Hospital by Elliott Fegelman, M.D.

405. Plaintiff Smith first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

406. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Smith suffered injuries and damages.

407. On or about November 29, 2005 Plaintiff Sposit underwent a da Vinci robot assisted prostatectomy at the Cleveland Clinic by Jihad Kaouk, M.D.

408. Plaintiff Estate of Sposit first discovered that his injuries were a proximate result of the da Vinci robot on or about March 5, 2013.

409. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Sposit suffered urinary incontinence and erectile dysfunction.

410. On or about December 22, 2011 Plaintiff Steinmetz underwent a da Vinci robot assisted surgery at The Christ Hospital by Marcia Bowling, M.D.

411. Plaintiff Steinmetz first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

412. As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Steinmetz suffered injuries and damages.

413. On or about November 22, 2010 Plaintiff Watts underwent a da Vinci robot assisted hysterectomy at Miami Valley Hospital in Dayton, Ohio by a physician whose name is unknown at this time but shall be ascertained during discovery.

414. Plaintiff Watts first discovered that her injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

415.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Watts suffered injuries and damages.

416.   On or about May 21, 2008 Plaintiff Winners underwent a da Vinci robot assisted prostatectomy at St. Vincent's Hospital in Toledo, Ohio by Dr. Hasselhoh.

417.   Plaintiff Winners first discovered that his injuries were a proximate result of the da Vinci robot on or about March 18, 2013.

418.   As a direct and proximate result of the defective robot, its improper and/or unlawful use of the robotic, Plaintiff Winners suffered urinary incontinence and erectile dysfunction.

## FIRST CAUSE OF ACTION
### (Strict Products Liability-Defective Design)
### (Intuitive)

419.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

420.   Intuitive Surgical is a medical device manufacturer who designs, manufactures, markets, and supplies a variety of medical products including, but not limited to, the Da Vinci surgical robot.

421.   Defendant Intuitive is a Delaware corporation with its principal place of doing business in Sunnyvale, California.

422.   Defendant Intuitive is a publicly traded company on the NASDAQ exchange, with a current market value of more than two billion dollars.

423.   Defendant designed, manufactured, tested, sold, promoted and labeled the Da Vinci surgical robot.

424. Defendants presented Plaintiffs with information and materials propounding the benefit of Da Vinci robotic prostatectomy, hysterectomies and other surgeries over all other methods. Specifically, Defendants told Plaintiffs that due to the Da Vinci robotic approach they would heal faster, have a shorter hospital stay, have a better outcome, have lower risk of complications, fewer days with a catheter, and have less pain. Defendants also provided some and/or all of the Plaintiffs a brochure outlining some of these benefits of Da Vinci robotic surgeries.

425. Based on the representations made by Defendants and the written materials provided to Plaintiffs, the Plaintiffs agreed to proceed with Da Vinci robotic operation.

426. On its website Defendant asserts that it is the global technology leader in surgical robotic products.

427. The robotic device is used in hospitals for a variety of surgeries, including prostatectomies, hysterectomies, and other surgical procedures.

428. Defendant has promoted its device as (a) safe, and (b) safer than other comparative methods of surgery.

429. Defendant utilizes prominent websites aimed at consumers, seeking to create demand for the use of its robotic device by patients who consult surgeons.

430. Defendant sold its device through a calculated program of intimidation and market management, forcing hospitals and physicians to purchase it in order to appear to be competitive, and creating a fear in their minds that if they did not have this technology they would lose business to competitors.

67

431. Defendant reinforced its calculated program, as stated in the preceding paragraph, by placing, on its website for potential patients, names of certain physicians who had performed 20 surgeries with the device.

432. The use of defendant's robotic device in surgery presents substantial risks of complications and injuries.

433. In addition, due to lengthened time of surgery, patients are unnecessarily exposed to anesthesia for a dangerous period of time.

434. Defendant is aware of the aforesaid risks and complications associated with the use of the said robotic device.

435. Defendant does not provide adequate warnings to physicians and patients about the risks and complications associated with the use of its robotic device.

436. Defendant has not done, nor sponsored, adequate testing on its said device before and after marketing it to determine whether in random tests its said device is either safer or more effective or otherwise superior to other surgical and laparoscopic methods to which it compares itself.

437. Defendant has not done adequate post marketing surveillance of complications and injuries that have occurred in actual practice.

438. Defendant has not done, nor sponsored, any testing as to long-term outcomes, in comparison to other surgical and laparoscopic methods.

439. Defendant has not revealed, through publications or reports to the Food and Drug Administration and other governmental bodies, the true extent of complications and injuries, which have occurred in actual practice.

68

440. Defendant has suppressed reports and complaints of complications and performance errors due to the use of its said device.

441. Defendant does not adequately train physicians nor proctor them properly on the use of its device, thereby inducing them to cause complications and injuries, which would be avoided in the hands of properly trained physicians.

442. Defendant represents that they will have skilled technicians in the operating room or on emergency call in the event of problems arising with its said device, but often has neglected to do so.

443. Defendant has over-promoted its device to hospitals, physicians and the public, including potential consumers, combined with minimizing the risks and complications associated with its use.

444. The device is defective in that it relies upon the use of monopolar energy to cut, burn and cauterize tissue, whereas safer methods are available such as bipolar energy and ultrasonic energy, which would reduce substantially the risk of complications.

445. The device has inadequate insulation for its arms thereby allowing electrical current to pass into tissue outside of the operative field.

446. The insulation on the shafts of the said device becomes torn and worn in places, without the awareness of the physician user, allowing electrical current to pass into tissue outside of the operative field, causing damage.

447. Defendant has failed to warn users and consumers of the said robotic device about the inadequate insulation on the arms and the potential for electrical

current to pass into tissue outside of the operative field.

448. Due to design defects, Defendant's devices have malfunctioned during the course of operative use causing injury, including the necessity of converting the procedure into open surgery.

449. Defendant has failed to warn users and consumers of its said device of the design flaws stated in the preceding paragraphs, although it has reached out directly to consumers to promote its asserted advantages.

450. Defendant had specific knowledge and awareness of the dangers of monopolar current and that there were safety modalities commercially available that could have greatly diminished or eliminated some of these risks, yet the Defendant elected not to include these safety features on the Da Vinci Robotic surgery platform.

451. Defendant has obtained and continues to maintain approval of the uses of its device from the Food and Drug Administration by failing to fully inform them of its knowledge of risks and complications associated with the use of its device.

452. Defendant placed into the stream of commerce its aforesaid device which was defective in design, as previously pleaded.

453. Defendant owed Plaintiffs a duty to exercise reasonable care when designing, testing, manufacturing, marketing, advertising, promoting, distributing, and/or selling Da Vinci Robots for surgery.

454. At all relevant times to this action, Defendant owed a duty to properly warn Plaintiff, the medical community, and the Public of the risks, dangers and adverse

side effects of the Da Vinci Robotic surgery platform.

455.    Defendant breached its duty by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of Da Vinci Robotic Surgery, as set forth below:

a)    Failing to test Da Vinci Robotic Prostatectomy properly and thoroughly before promoting the robotic surgical platform using monopolar current to the market;

b)    Failing to analyze properly and thoroughly the data resulting from the pre-marketing tests of monopolar current used in the Da Vinci Robotic prostatectomy;

c)    Failing to report to the FDA, the medical community, and the general public those data resulting from pre- and post-marketing tests of the Da Vinci Robotic prostatectomy platform which indicated risks associated with its use;

d)    Failing to conduct adequate post-market monitoring and surveillance of post-surgical complications associated with the Da Vinci Robotic surgery platform using monopolar current;

e)    Failing to conduct adequate analysis of adverse event reports;

f)    Designing, manufacturing, marketing, advertising, distributing and promoting the Da Vinci Robotic surgery directly to consumers, including Plaintiff, without adequate warning of the significant and dangerous risks of monopolar current and the Da Vinci Robotic surgery Platform and without proper instructions to avoid the harm which could foresee ably occur as a result of using monopolar energy on the existing Da Vinci Robotic surgery platform;

g)     Failing to exercise due care when advertising and promoting Da Vinci Robotic surgeries;

h)     Negligently continuing to manufacture, market, advertise, and promote Da Vinci Robotic surgeries after Defendant knew or should have known of the risks of serious injury associated with using monopolar current to perform certain aspects of the surgery;

i)     Failing to use due care in the preparation and development of the Da Vinci Robotic surgeries to prevent the aforementioned risk of injuries to individuals through the use of monopolar current;

j)     Failing to use due care in the design of the Da Vinci Robotic surgery platform with special regard to the insulation of the robotic arms and instruments to prevent the aforementioned risk of injuries to individuals during the routine course of surgery;

k)     Failing to conduct adequate pre-clinical testing and research to determine the safety of the use of monopolar current and the insulation of the robotic instruments to be used in robotic prostatectomy, with special regard to the reusing of the instruments in different patients;

l)     Failing to conduct adequate intra-operative surveillance and post-operative complication studies to determine the safety of the use of monopolar energy during the surgical robotic prostatectomy procedure taught by Intuitive while Defendant knew or should have known that intra-operative surveillance and post-operative complication analysis would be the only means to determine the relative risk of using monopolar during important surgical steps when performing robotic

surgeries and that such surveillance would be necessary for a due diligence program that would alert defendant to the need to change the technique for the use of monopolar current or to withdraw it from the market altogether;

m)   Failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing of issues with monopolar energy and post-marketing surveillance of monopolar energy related injuries and complications to Plaintiff, consumers, the medical community, and the FDA;

n)   Failing to accompany marketing materials promoting the Da Vinci Robotic surgery platform using monopolar current with proper warnings regarding all possible adverse side effects associated with the use of the same;

o)   Failing to use due care in the manufacture, inspection, and safety evaluation of the Da Vinci Robotic surgery platform to prevent the aforementioned risk of injuries to individuals who underwent a Da Vinci Robotic surgeries;

p)   Failing to use due care in the sale and marketing of the Da Vinci Robot to prevent the aforementioned risk of injuries to individuals who were to undergo robotic surgeries;

q)   Failing to use due care in the selling of the monopolar scissors to prevent the aforementioned risk of injuries to individuals who underwent Da Vinci Robotic surgeries;

r)   Failing to provide adequate and accurate training and information to the sales representatives who sold the Da Vinci Robot;

s)   Failing to provide adequate and accurate training and information to healthcare

73

providers for the appropriate use of the Da Vinci Robot for surgeries;

t)    Failing to conduct or fund research into the development of safer robotic surgical instruments which would pose the least risk of causing severe thermal injury to ureter, blood vessels, and other organs;

u)    Failing to educate healthcare providers and the public about the safest use of the monopolar scissors in Da Vinci Robotic surgery;

v)    Failing to give healthcare providers adequate information to weigh the risks of serious injury for a given patient using the Da Vinci Robotic surgery platform and technique featuring the use of monopolar current; and,

w)    Being otherwise reckless, careless and/or negligent.

456.   Defendant placed into the stream of commerce its aforesaid device, which was defective in its labeling and warnings, as previously pleaded.

457.   Defendant placed into the stream of commerce its aforesaid device, which was defective in its testing and approval, as previously pleaded.

458.   At the time the device left the possession of Defendant it was in an unreasonably dangerous and defective condition for application for robotic prostatectomy using monopolar energy.

459.   Despite the fact that Defendant knew or should have known that the Da Vinci Robotic surgery platform using monopolar current had increased the risk of serious injury and/or death, Defendant continued to promote and market the Da Vinci Robotic surgeries to consumers, including Plaintiffs, when safer and more effective methods of treatment were available.

460. The Defendant designed, tested, manufactured, packaged, marketed, distributed, promoted, and sold the Da Vinci Robot, placing the Da Vinci Robotic surgeries into the stream of commerce.

461. The Da Vinci Robot was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendant in a defective and unreasonably dangerous condition to consumers, including the Plaintiff.

462. The Da Vinci Robot was expected to reach, and did reach, users and/or consumers, including Plaintiffs, without substantial change in the defective and unreasonably dangerous condition in which it was manufactured and sold.

463. Plaintiffs'  surgeons used the Da Vinci Robotic surgery platform including monopolar current as instructed by and certified by and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendant.

464. The Da Vinci Robotic surgery platform was unreasonably dangerous in that, as designed, it failed to perform safely when used by ordinary consumers, including Plaintiffs' surgeons, including when it was used as intended and in a reasonably foreseeable manner.

465. The Da Vinci Robotic surgery was unreasonably dangerous in that, as designed, the risks of serious injury posed by its monopolar current risks exceeded any benefit the Robotic approach was designed to or might in fact bestow.

466. The Da Vinci Surgical Robot was defective in its design in that it neither bore, nor was packaged with, nor accompanied by, warnings adequate to alert the medical

community, including Plaintiffs' surgeons, to the risks described herein, including, but not limited to, the risk of serious injury and/or death, including bowel, bladder, ureteral, or vascular injury, posed by its monopolar current risks. The Da Vinci Robot was not accompanied by adequate labeling, instructions for use and/or warnings to fully apprise the medical, hospital, operating room and/or scientific communities, and potential patients, including Plaintiffs, of the potential risks and serious side effects associated with its use, thereby rendering Defendant liable to the Plaintiffs.

467. There were safer alternative energy modalities available including bipolar energy and ultrasonic energy.

468. Although Defendant knew or should have known of the defective nature of its Da Vinci Robotic surgery platform using monopolar current, it continued to design, manufacture, market, and promote the use of its Da Vinci Robotic surgery platform so as to maximize sales and profits at the expense of the public health and safety. Defendant thus acted with conscious and deliberate disregard of the foreseeable harm caused by the continued use of monopolar energy on its robotic platform.

469. Plaintiffs could not, through the exercise of reasonable care, have discovered the risk of serious injury and/or death associated with and/or caused by the Da Vinci Robotic surgery platform featuring monopolar current. Plaintiffs, if aware of these additional risks, could have chosen surgical procedures with similar efficacies but without these additional risks. As a result, Plaintiffs suffered the personal injuries

described herein.

470.  Information given by Defendant to the medical community and to the consumers concerning the safety and efficacy of the Da Vinci Robotic surgery platform, especially the information contained in the advertising and promotional materials, did not accurately reflect the serious side effects.

471.  As a direct and proximate consequence of Defendant's negligence, willful, wanton, and/or intentional acts, omissions, misrepresentations and/or otherwise culpable acts described herein, the Plaintiffs sustained injuries and damages alleged herein.

472.  Defendant's conduct in continuing to market, sell and distribute the aforesaid devices after obtaining knowledge they were defective and not performing as represented and intended, showed complete indifference to and/or a conscious disregard for the safety of others justifying an award of punitive damages for aggravating circumstances in such a sum which will serve to deter defendant and others from similar conduct in the future.

473.  No alerting or cognizable event occurred that could have or should have alerted Plaintiff to the inadequate warning given by Intuitive with regard to the Catheter and Endoscope until after June 1, 2011.  Plaintiff was reasonably unaware that Intuitive played any role in causing his injury until on or after that date.

### SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY-INADEQUATE WARNING

474.  Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

475.  Defendant is the manufacturer, designer, distributor, seller, and/or supplier of the

Da Vinci Surgical Robot.

476. The surgical robot manufactured, designed, distributed, sold, and/or supplied by the Defendant and used pursuant to the Defendant's advice, instruction, and/or consent was defective due to inadequate warning or instruction because the Defendant knew or should have known that the devices created significant risks of serious bodily harm to consumers and failed to adequately warn consumers of such risks.

477. As a direct and proximate result of the use of the Da Vinci surgical robot, as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendant and subsequently altered upon the advice, instruction, and/or consent of the Defendant, Plaintiff suffered serious physical injury, harm, damages, and economic loss and will continue to suffer

478. Defendant's actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, warranting the imposition of punitive damages.

479. No alerting or cognizable event occurred that could have or should have alerted Plaintiff to the inadequate warning given by Intuitive with regard to the Catheter and Endoscope until after June 1, 2011.  Plaintiffs were reasonably unaware that Intuitive played any role in causing his injury until on or after that date.

### THIRD CAUSE OF ACTION
### BREACH OF WARRANTY
### (Intuitive)

480. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

481.    Defendant expressly warranted that the Da Vinci Surgical Robots were safe and effective medical devices.

482.    The Surgical Robots manufactured and sold by Defendant did not conform to these express representations because Defendant knew or should have known that the devices would cause serious injury to Plaintiffs.

483.        No alerting or cognizable event occurred that could have or should have alerted Plaintiff to the inadequate warning given by Intuitive with regard to the Catheter and Endoscope until after June 1, 2011.   Plaintiffs were reasonably unaware that Intuitive played any role in causing his injury until on or after that date.

484.    As a direct and proximate result of Defendant's breach of warranty, Plaintiffs have suffered serious physical injury, harm, damages, economic loss and will continue to suffer such harm, damages, and economic loss in the future

## FOURTH CAUSE OF ACTION
## STATUTORY PRODUCTS LIABILITY

485.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

486.  The Defendants, jointly and severally, have violated the provisions concerning product liability pursuant to O.R.C. 2307.71 et seq., entitling Plaintiffs who are Ohio residents, to relief.

## FIFTH CAUSE OF ACTION
## Breach of Implied Warranty
## (Intuitive)

487.  Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of

this Complaint as if fully rewritten herein.

488. At the time Defendant designed, manufactured, marketed, sold, and distributed the Da Vinci Surgical Robot for use upon Plaintiffs, Defendant knew or should have known of the intended use for the Catheter and the Endoscope, as used pursuant to the advice, instruction, and/or consent of the Defendant, yet still impliedly warranted that the altered Catheter and Endoscope were of merchantable quality and safe for such use.

489. Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether the Surgical Robot, as used according to the advice, instruction, and/or consent of the Defendant, were of merchantable quality and safe for their intended use and upon Defendant's implied warranty as to such matters.

490. Contrary to such implied warranty, the Da Vinci Surgical Robot, as used according to the advice, instruction, and/or consent of the Defendant, was not of merchantable quality or safe for its intended use.

491. No alerting or cognizable event occurred that could have or should have alerted Plaintiff to the inadequate warning given by Intuitive with regard to the Catheter and Endoscope until after June 1, 2011. Plaintiffs were reasonably unaware that Intuitive played any role in causing his injury until on or after that date.

492. As a direct and proximate result of Defendant's breach of warranty, Plaintiffs suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

**SIXTH CAUSE OF ACTION**

80

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle,
Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against
Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao,
Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen.
Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

493.  Plaintiffs incorporate all previous paragraphs as if fully rewritten herein.

494. Plaintiff states that Defendants CCF, Cosgrove, Kaouk, Goel, Zhao, Gill,  Hafron,

Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Weight, Nguyen,

Subramanian, and Henderson and their  agents and/or employees were

negligent, reckless, and/or wanton and departed from the accepted standards of

medical care in failing to properly monitor, diagnose, and treat Plaintiff which

negligence and departures from the accepted standards of medical care

proximately resulted in injuries and damages to the Plaintiffs as pled herein.

495. Plaintiffs state that as a direct and proximate result of the Defendants'

departures from the accepted standards of medical care, its wrongful conduct

and malpractice, the Plaintiffs sustained severe and permanent injuries; that

their injuries are disabling and permanent; that they been deprived or their

ability to enjoy life; that they have suffered economic and non-economic

damages in the past and in the future; and that they have suffered great mental

anguish and emotional distress.

496. Plaintiffs state that as a direct and proximate result of the Defendants'

negligence and departures from the accepted standard of care, their wrongful

conduct and malpractice, as aforesaid, Plaintiffs have been required to submit to

numerous and extensive medical treatment, x-rays, examinations, surgeries,

treatments, hospitalizations, including the taking of medications in an effort to control the conditions from which they suffer; that they have incurred medical and medicinal expenses to date in an amount yet to be determined; and that they will be required to incur additional medical expenses into the future to an extent that cannot be determined, nor with reasonable diligence ascertained at this time, but are reasonably certain to occur.

497.   Further pleading, Plaintiffs state that as a direct and proximate result of the Defendants' negligence and departures from the accepted standards of medical care, their wrongful conduct and malpractice, they have been required to limit their normal activities and will be required to limit their normal activities into the future, that they have suffered great physical pain of the body and suffering of the mind and will continue to suffer great physical pain of the body and suffering of the mind into the future.

## SEVENTH CAUSE OF ACTION
### (Wrongful Death and Survivorship Claim of Donal Sposit)

### (Against Defendants Cleveland Clinic Foundation, Kaouk, Hegarty, and Wood)

498.  Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

499.  Carol Sposit is the executor of the Estate of Donal Sposit having been appointed same in the Cuyahoga County Probate Court in Case No. 2010EST160085 on the 21st day of July, 2010.

82

500. Plaintiff Carol Sposit states that as a direct and proximate result of the negligent, reckless, wanton, will, and intentional conduct and medical negligence of Defendants CCF and Kaouk, Hegarty, and Wood, Plaintiff's decedent Donal Sposit met his death on July 5, 2010.

501. The Plaintiff's decedent left surviving a spouse and other next-of-kin for whose benefit this action is brought.

502. As a direct and proximate result of the wrongful conduct and medical malpractice of Defendants CCF, Kaouk, Hegarty, and Wood, jointly and severally, the decedent's wife and other next-of-kin have been deprived of the decedent's loss of support, loss of services, loss of society, loss of companionship, loss of consortium, loss of care, loss of assistance, loss of attention, loss of protection, loss of advice, loss of guidance, loss of counsel, loss of instruction, loss of training, loss of education, loss of prospective inheritance, and have suffered emotional trauma and mental anguish by reason of the wrongful death of the decedent.

503. Plaintiff Carol Sposit has incurred funeral expenses in the approximate sum of $10,000.00 by reason of the wrongful death of the decedent.

## EIGHTH CAUSE OF ACTION
### (Survivorship Claim of Donal Sposit)

### (Against Defendants Cleveland Clinic Foundation, Kaouk, Hegarty, and Wood)

504. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

505.   As a direct and proximate result of the joint and several wrongful conduct of Defendants CCF, Kaouk, Hegarty, and Wood, as aforesaid, Donal Sposit suffered severe and permanent injuries resulting in his death.

506.   As a direct and proximate result of the joint and several conduct of the Defendants CCF, Kaouk, Hegarty, and Wood as aforesaid, Donal Sposit suffered a complete loss of enjoyment of life.

507.   As a direct and proximate result of the joint and several wrongful conduct of Defendants CCF, Kaouk, Hegarty, and Wood as aforesaid Donal Sposit suffered extreme pain, suffering, mental anguish, intentional/negligent inflection of emotional distress and a loss of income and earning capacity in an amount yet to be determined.

## NINTH CAUSE OF ACTION
## LOSS OF CHANCE OF RECOVERY

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

**Pursuant to OJI CV 417.15; *Geeasman v. St. Rita's Medical Center,* 183 Ohio App.3d 555, 2009-Ohio-3931, 917 N.E.2d 867; *Roberts v. Ohio Permanente Medical Group,* 76 Ohio St.3d 483, 1996-Ohio-375, 668 N.E.2d 480; *McMullen v. Ohio State Univ. Hosp.,* 88 Ohio St.3d 332, 2000-Ohio-342, 725 N.E.2d 1117.**

508.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

509.   The use of robotic surgery instead of open surgery by an experienced and

qualified physician reduced the chances of the Plaintiffs' recovery as aforesaid.

510. The lack of medical instruction of alternatives reduced chances of recovery as aforesaid, proximately resulted in the injuries and damages aforesaid.

511. The aforesaid care and treatment was not only negligent but was reckless, wanton, willful, intentional/malicious entitling the Plaintiffs to punitive damages.

### TENTH CAUSE OF ACTION
### CIVIL BATTERY
**Pursuant to OVI CV 429.03; *Love v. Port Clinton*, 37 Ohio St.3d 98, 524 N.E.2d 166 (1988); *Perna v. Pirozzi,* 92 N.J. 446, 457 A.2d 431 (1983)**

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek, and Henderson)**

512. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

513. The surgical procedures and treatment of the Plaintiffs by unqualified and untrained doctors was intentional.

514. As a proximate result of the battery the Plaintiffs are entitled to compensatory and punitive damages, with or without other comparable injuries and damages, which they aver they have also incurred.

### ELEVENTH  CAUSE OF ACTION
### DUTY TO DISCLOSE / NOT DISCLOSE / NOT CONCEAL / FIDUCIARY DUTIES BREACHED

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek, and Henderson)**

Pursuant to *Estate of Leach v. Shapiro*, 13 Ohio App.3d 393, 469 N.E.2d 1047 (1984); *Ault v. Hall*, 119 Ohio St 422, 434, 164 N.E. 518, 522 (1928); *Turner v. Children's Hospital Inc.*, 76 Ohio App.3d 541, 552, 602 N.E.2d 423 (1991); *Phillips v. Good Samaritan Hospital*, 65 Ohio App.2d 112, 416 N.E. 2d 646 (Ohio App. 2d Dist. 1979); *Hanshaw v. River Valley Health System*, 152 Ohio App.3d 608, 2003-Ohio-2358, 789 N.E.2d 680, 687; *Congrove v. Holmes*, 37 Ohio Misc. 95, 103, 308 N.E.2d 765, 770 (Ohio C.P 1973); American Jurisprudence 2d 1981, § 298, Physicians, Surgeons, and other healers, 167; 49 ALR 3d 501, 504; *Leuttke v. St. Vincent Mercy Medical Center*, 6th Dist. No L-05-1190, 2006-Ohio-3872 (Ohio App. 2006) (physicians, must disclose their experience and level of training to patients; *Hernandez v. Smith*, 552 F.2d 142 (5th Cir. 1972); *Bach v. DiCenzo*, 8th Dist. No. 84396, 2005-Ohio-2611 (Ohio App.2005); *Truck Insurance Exchange v. County of Los Angeles*, 95 Cal App. 4th 13, 21-22, 115 Cal. Rptr.2d 179 (Cal App 2002); *Gillette v. Tucker*, 67 Ohio St. 106, 121-122, 65 N.E. 2d 865 (1902); *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 56, 514 N.E.2d 709 (1987).

515. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

516. The Defendants had an affirmative duty to disclose to the Plaintiffs any and all material information about their diagnosis, examinations, tests, surgical results, all those providing care to Plaintiffs, medical records, Plaintiffs' conditions, and all other matters before, during, and after of duties attendant upon all aforesaid named Defendants.

517. The Defendants, together with their employees and/or agents occupied a fiduciary relationship, as well as the normal duties attendant to their status, professions, and the facts alleged.

518. The Defendants had an affirmative duty not to delay, conceal, obfuscate or otherwise breach their duties to inform the Plaintiffs of all material matters before,

during, or after the care and information requests described in the facts of their case.

519. The Defendants jointly and severally breached their duties to the Plaintiffs causing them injury and damages as pled herein, and entitling the Plaintiffs to plead damages including punitive damages, as proximate result of the breach of duties/fiduciary duties to disclose to the patients and not to disclose to the patients and not to conceal, delay, or deny that which Plaintiffs have a right to know particularly in regard to one's health, options for treatment, skill, training and experience of all Defendants who treated or cared for Plaintiffs, medical records information, billing information, complete facts and claim statuses about their treatment and all other attendant duties to disclose and not conceal, delay, or obstruct that which the Plaintiffs have a right to know.

## TWELFTH  CAUSE OF ACTION
## BREACH OF CONTRACT / GUARANTEE

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

    a. **Pursuant to *Lovely v. Percy*, 160 Ohio App.3d 269, 2005-Ohio-1591, 826 N.E.2d 909 (Ohio App. 2d Dist.) (a doctor and patient can enter into a "satisfaction contract" that is separate and distinct from the primary contract between a doctor and patient for medical care. Further, a breach does not require the showing of medical malpractice); *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431 (1983); OJI CV 501.01.**

520. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

521.    The Defendants and the Plaintiffs negotiated a contract wherein Defendants guaranteed:

b.      The Robotic/Da Vinci machine would be utilized as the very best option given their medical characteristics.

c.      That the surgeons were Board Certified and highly qualified to perform da Vinci robotic surgeries safely and competently

522.    These guarantees were made to Plaintiffs and were material to entering into the contract with Defendants.

523.    The guarantees such as risks and benefits, alternative treatments were put in writing in a consent form and/or required to have been put into writing in a consent form. The contract guarantees were material.

524.    The contract / guarantee was to be performed immediately and was breached in total / within one (1) year.

525.    The actual performance by Defendants of the complete surgery, treatment, and follow-up care was the subject matter of the contract and guarantee and was material.

526.    The Plaintiffs had substantially performed at the time of Defendants' breach.

527.    The Defendants breached the said contract / guarantee.

528.    The breaches proximately caused damages and injuries to Plaintiffs as pleaded herein and caused or precipitated the tortious conducted included herein. Also, the breach not only caused the aforesaid compensable injuries, but great emotional damages and consequential damages.

529. The aforesaid breaches of contract/guarantees were also contemporaneously and subsequently accompanied by the tortious activities plead herein entitling the Plaintiffs to punitive damages.

### THIRTEENTH CAUSE OF ACTION
**(Negligence/Negligence Per Se; Breach of Contract)**

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Medicare, Anthem Blue Cross/Blue Shield; Ohio Department of Job & Family Services and United Health Care and any other health care payor )**

**Pursuant to *Insco v. Aetna Health & Life Insurance,* 673 F. Supp. 2d 1180 (D. Nev. 2009); *Helen Meyers v. Health Plan of Nevada*, Dist. Ct. Clark Co., Nevada, Case No. A583799 (2009-2013)**

530. Plaintiffs incorporate the allegations of the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

531. Plaintiffs Chyi, Perrotti, Razem, Sposit at the time of the surgery at issue in this case, were insured by a policy of medical/health care insurance issued by Defendant Medicare.

532. Plaintiff Mergler at the time of the surgery at issue in this case, was insured by a policy of insurance issued by Blue Cross/Blue Shield.

533. Plaintiff Williams at the time of the surgery at issue in this case was insured by a policy of insurance issued by the Ohio Department of Job & Family Services

534. Plaintiff Razem at the time of the surgery at issue in this case was insured by a policy of insurance issued by United Health Care.

535. Defendants Medicare, BC/BS, ODJFS, UHC, and other unknown health care payors

are managed care organizations

536. Defendants engage in managing the medical care of their insureds/members.

537. Managed care is quality driven health care and is intended to focus on improving and maintaining the health of the insured member.

538. Defendants contract with certain medical providers to provide health care services to their insureds. Those providers are commonly referred to as contracted providers.

539. Under the terms of the contract with the Defendants, the contracted provider agrees to provide health care to insurers and members of the Defendants from qualified providers, for qualified medical services, and the insurer will pay for same to the extent provided.

540. Defendants agree to pay the contracted provider for the services provided to their insurers.

541. Defendants agree to require and/or encourage their insurers to receive health care from the contracted providers.

542. The insured or member is one of the primary and intended beneficiaries of Defendants' contract with the contracted provider.

543. The insured or member ha a reasonable expectation Defendants will require that:

d. The contracted provider follow generally accepted clinical and medical practices;

e. The contracted provider will provide quality health care to the insured; and

f. The contracted provider will not engage in fraudulent or deceptive practices.

544. Defendants have the right under the contract to evaluate, audit, monitor or

supervise their contracted providers to ensure that contracted providers provide quality and reasonable health care to the Defendants' insured/members.

545. Defendants can terminate their contract with any contracted provider who engages in unsafe, fraudulent, deceptive or unreasonable business practices.

546. To protect the interest of its insured, industry standards provides that Defendants will evaluate, audit, monitor and supervise its contracted provider to ensure that the contracted provider is using reasonable practices in the treatment of its insured/members.

547. To protect the interest of the insured, Defendants had to adopt and implement a quality assurance program.

548. Industry standards provide that Defendants adopt and implement a quality assurance program.

549. Through quality assurance, Defendants must direct, evaluate, and monitor the effectiveness of health care services provided by the contracted provider.

550. Defendants have contracted with the Cleveland Clinic, and the doctors, and other employees associated with the hospital for purposes of having their insurers receive medical care.

551. At all pertinent times, Defendants knew, or should have known, of the improper practices of Defendants as set forth above.

552. In their relationship with the Cleveland Clinic, the doctors, and other employees associated with the CCF, Defendants, including Medicare, ODJFS, BC/BS and UHC, and other insurance payors, did not reasonably conduct quality assurance

91

including evaluation, audit, monitor, and supervise the Defendants and their practice.

553.   Defendants, or their affiliated physicians, did not terminate their relationship with CCF or other Defendants to discontinue the infliction of these unauthorized practices upon other victims.

554.   Defendants did not take reasonable steps to stop the Defendants' practices or to warn their insured/members of the practices.

555.   Ohio Revised Code 1751.73 imposed on all Health Insuring corporations operating in the State of Ohio a duty to "implement [a] quality assurance program."

556.   The statute provides that:

> Each health insuring corporation providing basic health care services shall implement a quality assurance program for use in connection with those policies, contracts, and agreements providing basic health care services. Each health insuring corporation required to implement a quality assurance program shall annually file a certificate with the superintendent of insurance certifying that its quality assurance program does all of the following:
> a)   Identifies a corporate board or committee or designates an executive staff person responsible for program implementation and compliance;
> b)   Includes a process enabling the selection and retention of quality providers and health care facilities through credentialing, re-credentialing, and monitoring procedures;
> c)   Provides for ongoing monitoring of the quality assurance program;
> d)   Assurance a process for compliance by any entity or entities with which the health insuring corporation contracts for services;
> e)   Includes a process to take remedial action to correct quality problems.

557.   The statute evinces the clear intent of the legislature to protect insureds like Plaintiffs against the kinds of harm the Plaintiffs have pled herein.

558. The statute, therefore, creates and/or recognizes a legal duty to the Plaintiffs on the part of Medicare, ODJFS, BC/BS, UHC, and other health care payors.

559. Plaintiffs are with a class of persons intended to be protected by R.C. 1751.73 and other statutes and regulations of the State of Ohio.

560. The injuries Plaintiffs have sustained are the type that were intended to be prevented by R.C. 1751.73 and other statutes and regulations of the Station of Ohio.

561. Medicare, ODJFS, BC/BS, UHC, and other health care payors violated their duties to the Plaintiffs by failing to properly investigate and remedy the problems with Defendants.

562. Defendants Medicare, ODJFS, BC/BS, UHC, and other health care payors, by coming into Ohio, as well as perhaps other statutes in other states, imposed their legal duty upon tier said insurer.

563. By being allowed to provide insurance in the State of Ohio there is a duty to protect the public, including Plaintiffs; said duty being breached herein.

564. As a proximate and legal cause of Defendants' negligence, Plaintiffs, as set forth herein, have sustained damages to which Plaintiffs are entitled to recover, as aforesaid.

565. This cause of action has a minimum six (6) year statute of limitations, again from the date of discovery.

**FOURTEENTH CAUSE OF ACTION**
**LACK OF INFORMED CONSENT**
**(RATIFICATION AND ADOPTION)**

**(Medical Negligence as to Cleveland Clinic Patients –Mergler, Perrotti, Razem, Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Weight, Subramanian, Arnon, El-Hayek, and Henderson)**

**Pursuant to OJI 417.05 and Ohio Rev. Code § 2317.54 (per se); *Nickell v. Gonzalez*, 17 Ohio St.3d 136, 477 N.E.2d 1145 (1985); *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972); *Bruni v. Tatsumi, supra*.**

566.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

567.   The Defendants failed to inform Plaintiffs about the material risks in the surgery, including:

g.   True risks of pain, suffering, disability, and injury.

h.   True alternative and preventable methods of treatment.

568.   The risks and dangers that should have been disclosed actually occurred and were approximate cause of the injuries, harm, and damages to the Plaintiffs.

569.   A reasonable person in the Plaintiffs' position would have decided against the surgery, method, manner, and actual plan of treatment and follow-up if the material risks independent and inherent to the surgery, and the actual means used for surgery had it been disclosed to them prior to the actual treatment or lack of treatment by the method wrongly concealed but undertaken by Defendants.

570.   Defendants did not disclose material risks to the Plaintiffs.

571.   The lack of informed consent was negligent, reckless, wanton, willful, and malicious conduct.

572.   As a proximate result the Plaintiffs have suffered the injuries and damages

aforesaid and is entitled to punitive damages as well.

573. The Defendants lacked good faith and failed to comply with Ohio Rev. Code § 2317.54, entitling Plaintiffs to judgment as a matter of law and entitling them to compensatory and punitive damages for the injuries and damages averred by the Plaintiffs herein.

574. The Defendants jointly and severally adopted and/or ratified the wrongful acts of each other.

## FIFTEENTH CAUSE OF ACTION
## NEGLIGENT/WRONGFUL CREDENTIALING
## FAILURE TO DISCIPLINE/RATIFICATION

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek, and Henderson)**

**Pursuant to Ohio Rev. Code § 2305.24; *Schelling v. Humphrey*, 123 Ohio St.3d 387, 2009-Ohio-4175, 916 N.E.2d 1029; *Clark v. Southview Hosp. & Family Ctr.*, 68 Ohio St.3d 435, 1994-Ohio-519, 628 N.E.2d 46; *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990); *Richards v Kerlakian*, 162 Ohio App.3d 823, 2005-Ohio-4414, 835 N.E.2d 768; *Lewis v. Sarin*, Mont. C.P. No. 2005 CV 1936 (Ohio C.P. Jan. 7, 2011); *Browning v. Burt*, 66 Ohio St.3d 544, 566, 1993-Ohio-178, 613 N.E.2d 993; Joint Commission on Accreditation of Health Care Organization Standards (2002), 294 M.S. 512 et seq.**

575. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

576. The Defendants and agents and employees, knowingly misrepresented the credentials of Defendants.

577. Defendants advertised the credentials of Defendants and their urology department

falsely, thereby waiving any claim of privilege to the credentialing process, reviews, and documents.

578. The Defendants' lack of represented credentials were a substantial factor in proximately causing the torts, non-torts claim, injuries, and damages to the Plaintiffs.  Plaintiffs never would have undergone the surgeries had they known Defendants grossly misrepresented them amount of training to use the da Vinci.

579. The Defendants recognized Defendants' lack of credentials and the credentialing process was negligently, reckless, wantonly, willfully, or intentionally below the standard of care for such credentialing, and as to constructive fraud as well.

580. The Defendant failed to maintain the Joint Commission's Accreditation Standards and thereby forfeited any presumptions of lawful credentialing.

581. The Defendants failed to take any action, disclose, correct, or otherwise conduct adequate lawful peer review of the facts and competency of the Defendant doctor. Any confidentiality claim has been waived under the crime / fraud exception, and advertisements, publications and representations made by and their physicians, employees, and agents.

582. As a proximate result of the acts and omissions of the Defendants listed above, the Plaintiffs are entitled to compensatory and punitive damages with or without other comparable injuries and damages, which they aver they have also incurred.

## SIXTEENTH CAUSE OF ACTION
## NEGLIGENT REFERRAL/SUPERVISION

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao,**

**Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

**Pursuant to *Berdyck v Shinde, supra*, 583 Am. Jur. 2d (2010), Physicians, Surgeons, and Other Healers, D, 5273; *Reed v. Bascon* 124 Ill.2d 386; 530 N.E.2d 417 (Ill. 1988) (a referring physician will be held liable for the acts of the other physician where the referral was itself negligent); *Bach v Dicenzo, supra; Hernandez v. Smith, supra;  Luettke v St. Vincent Medical Center, supra; Faulkner v Pezeshki*, 44 Ohio App.2d 186, 337 N.E. 2d 158 (1975).**

583.    Plaintiff  incorporates the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

584.    The Defendant doctor was inadequately trained to perform the Da Vinci robotic surgery for the Plaintiff.

585.    All Defendants had duties not to refer the Plaintiff to inadequately trained surgeons.

586.    Defendants had a duty to supervise the surgery performed upon the Plaintiff.

587.    All Defendants were reckless, willful, wanton, intentional, and malicious in the referral and supervision of the Plaintiff's surgery.

588.    As a proximate result of the referral and lack of supervision the Plaintiff proximately suffered injuries and damages as alleged herein.

<u>**SEVENTEENTH CAUSE OF ACTION**</u>
<u>**CORPORATE LIABILITY AND INADEQUATE**</u>
<u>**POLICIES/STANDARDS/PROCEDURES**</u>
<u>**FAILURE TO FOLLOW**</u>

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Weight, Subramanian, Arnon, El-Hayek,  and Henderson)**

     **i.** **Pursuant to *Gray v. Grandview Hosp.*, 2d Dist. No. 5849, 1979 Ohio App. LEXIS 8753; *Clark v. Southview Hosp., supra*; *Eiford v. Burt*, 2d Dist. No. 12392, 1994 Ohio App. LEXIS 3792; *Laderer v. St. Rita's Medical Ctr.*, 122 Ohio App.3d 587, 702 N.E.2d 476 (1997); *Hannola v. Lakewood*, 68 Ohio App.2d 61, 426 N.E.2d 1187 (1980); *Vanderpool v. Univ. Hosp., Inc.*, 1st Dist. No. C-020020, 2002-Ohio-5092; *Nickler v. Mercy Med. Ctr.*, 5th dist. No. 2002CA00169, 2003-Ohio-545.**

589.  Plaintiffs  incorporates the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

590.  Defendants failed to implement adequate policies and procedures and/or failed to follow policies and procedures for patient safety to meet represented standards of care and to prevent fraudulent or false practice of medicine, billing, investigation, credentialing, supervision and other causes of action averred herein.

591.  The failure to implement and enforce adequate policies and procedures proximately caused injuries and damages averred to the Plaintiffs.

### EIGHTEENTH  CAUSE OF ACTION
### FRAUD/MISREPRESENTATION/CONCEALMENT/CONSTRUCTIVE FRAUD

**(Medical Negligence as to Cleveland Clinic Patients – Chyi, Eisnaugle, Fulmer, Mergler, Perrotti, Razem, Sposit, Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

**Law:  OJI 449.03, *Burr v. Stark County Board of Commissioners*, 23 Ohio St. 3d 69, 491 N.E. 2d 1101 (1986); *Gaines v. Preterm-Cleveland, Inc., supra*; *Hanes v. Giambrone*, 14 Ohio App. 3d 400, 471 N.E. 2nd 801 (1984)**

592.   Plaintiffs incorporate all the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

593.    The Defendants jointly and severally, as providers of medical care and medical devices/procedures to the public in general, and Plaintiffs in particular, have a special confidential relationship with Plaintiffs which afford the Defendants the powers, means, and opportunities to take advantage and exercise undue influence and control over Plaintiffs.

594.    The relationship of Plaintiffs and public to the Defendants are value to social, economic, and welfare interests based upon an enforced confidence of the Plaintiffs and public in the Defendants and the Defendants joint and several representatives about the medical matters, care, follow-up care and billings provided by the Defendants.

595.    The breach of these valuable social, economic, welfare interests, and enforced concepts of trust and fiduciary relationships, along with the expressed representation by Defendants caused injury and damages to the Plaintiffs.

596.    Unlike the fraud/misrepresentation/concealment claim made herein, the elements of constructive fraud do not require knowledge on the part of the Defendants to be actionable.

597.    Defendants made false representations of facts and concealment of facts to Plaintiff as to the competency, care and treatment, the information provided for informed consent, credentialing, and other facts alleged in the facts.

598.    Defendants' representation and concealment were made with knowledge of their falsity or with utter disregard and recklessness about their falsities that knowledge may be concluded.

599. The false, misleading, and/or concealment of facts were done when there was a duty to disclose.

600.  The representation and concealment was material to the transaction, which Plaintiffs' agreement to submit to medical care and payment of fees.  The Plaintiffs were justified in relying on the representations and concealments and did, in fact, so rely.

601. The Plaintiffs were proximately injured and damages by their reliance on the representations and concealments.

### NINETEENTH CAUSE OF ACTION
### MEDICAL RECORDS VIOLATIONS AND NON DISCLOSURE

**(Medical Negligence as to Cleveland Clinic Patients –Mergler, Perrotti, Razem Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, , Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Weight, Subramanian, Arnon, El-Hayek,  and Henderson)**

**Pursuant to Ohio Rev. Code 3701.74; *Ruth v. Moncrief,* 2d Dist. No. 18479, 2001-Ohio-1709; *Johnson v. Hillcrest Health Center*, 2003 OK 16; 70 P.3d 811 (Okla. 2003), Health Information Portability and Accountability Act of 1996 (HIPAA)**

602. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

603. The Defendants are under a duty to correctly make, maintain, and provide, correct entries in medical records.

604. Other health care providers, payers, and insurers have rights to these records and are fully warranted in depending upon the reliability and trust otherwise of said records.

605. There is no more important duty than to make accurate medical records, prevent

their loss or destruction, as physicians are fully warranted in depending upon the reliability and trustworthiness of such records, including the subsequent treatment of the patient, other physicians, and health care providers.

606.   The Defendants' breach of their duty to create and the medical records of the Plaintiff have proximately caused injuries and damages (including punitive).

## TWENTIETH CAUSE OF ACTION
## ABANDONMENT

**(Medical Negligence as to Cleveland Clinic Patients –Eisnaugle, Fulmer, Mergler, Razem, , Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)**

**Pursuant to *Gillette v. Tucker*, *supra*; *Newman v. Sonnenberg*, 2003 UT App 401, 81 P.3d 808, 810 (UT. App 2003); *Ricks v. Budge*, 91 Utah 307, 64 P. 2d 208 211-212 (UT 1937); *Walters v. Middletown Hospital Association*, 12th Dist. No. CA84-07-083, 1985 Ohio App Lexis 6157 (12th Dist. 1985); *Maddon v. Albainy*, 8th Dist. No. 55301, 1989 Ohio App Lexis 1445 (April 20, 1989); *Lee v. Dewbre*, 362 S.W. 2d 900, 901, 903 (Tex. App 1962).**

607.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

608.   Defendants were responsible for all follow up care and represented they would provide same.

609.   Defendants abandoned all/or some of the required follow up care after the surgery.

610.   Defendants did not realize the extent of Plaintiffs' medical condition and failed to treat them personally with the necessary care, experience, training, and education.

611.   As a proximate result of the wrongful conduct of the aforesaid Defendants,

Plaintiffs suffered injuries and damages as aforesaid.

## TWENTY-FIRST CAUSE OF ACTION
## DECLARATORY

## (Medical Negligence as to Cleveland Clinic Patients –Eisnaugle, Fulmer, Mergler, Razem, , Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek,  and Henderson)

## (Declaratory Relief / Declaration of Unconstitutionality
## Federal Questions / Supplemental Jurisdiction over State-Law Claims)

612.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

613.   Plaintiffs pray that the Court issue declaratory judgment and relief and an order pursuant to R.C. 2721.01, et seq., Federal and Ohio Civil Rules 1, 2, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 19.1, 20, 21, 22, 23, 26-37, 38, 3, 41 , 42, 47, 48, 49, 50, 51, 54, 55, 56, 57, 58, 59, and 60, and the unlawful provisions of the Ohio Medical Malpractice Acts, as amended, and "Tort Reform Act,"[11]  especially as to involvement or non-involvement of parties; inclusion in the claim of unknown and unpleaded parties, requiring the Defendants to plead, by way of answer,

---

[11] The Medical Malpractice Tort Reform laws, known as S.B. 281, effective April 9, 2003 (including negligent credentialing statute, i.e. R.C. 2305.251), and H.B. 215, effective September 13, 2004. The declaratory judgment relief sought also seeks that S.B. 120 (joint and several liability), effective April 9, 2003, and S.B. 80 ("tort reform"), effective April 7, 2005, (including punitive damages, R.C. 2315.21), be declared unconstitutional into, or as they relate to medical malpractice claims in general (including declaring the invalidity of compensatory damage caps that are totally inadequate for these Plaintiff, and the destruction of the collateral source evidentiary rules which constitutes a denial of due process and equal protection, unconstitutional takings of future damages awards through judicially imposed reductions, statutory reductions for failure to join "necessary" parties, imposition and assignment of liability to "empty chair" defendants (i.e., R.C. 2307.22-2307.28) (unless determined not applicable to the case at bar, as pleaded herein), discriminatory subrogation, and imposition of other unconstitutional substantive and procedural requirements), and to this case in particular, as well as all of said acts being declared unconstitutional in their entirety, jointly and severally as to all tort claims, or as they relate to these claims at bar. The case of Arbino v. Johnson & Johnson, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 240, supports this claim.  The full challenge with a separate outline will be filed within 30 days.  The outline will point out the errors of the Court in the first holding, which equated governmental defendants with private defendants, did not address the right to petition government and prior restraint on speech, special privileges, and other issues.

cross-claim, counterclaim, or other pleading or motion, identify, and produce evidence on the liability of all potential parties, or any unnamed persons, entities, or otherwise who may be liable to the Plaintiff or defendants, jointly or severally, or who otherwise are suitable, necessary or indispensable (indispensable and permissive parties and claims) for joinder, for all claims necessary for a full, complete and timely adjudication of all causes and claims, including defenses, subrogation, indemnification, adjudication of all causes of action, contribution to any party or potential party to the litigation of any potential claim in this case, which will allow the early and timely resolution of said issues at the pleading stage, prohibition of any special immunities or privileges thereunder. This declaration is sought prior to the actual litigation of the claims, as the issues are ripe and will affect the litigation of this case as the issues raised are inherent to the litigation process, and are especially imminent in the case at bar.[12]

614. Plaintiffs pray the Court issue a declaratory order finding that the aforementioned statutes are unconstitutional in whole or in part, denying equal protection, due process, right to petition, freedom of speech, open courts, and many others contrary to both the Ohio and United State Constitutions. Plaintiff pray the Court issue a declaratory order finding that the aforementioned statutes are self-contradicting, inconsistent, violate Ohio and United States Constitutions, common law, existing statutory law, local rules of Court and Ohio Evidence Rules 102, 103, 104, 201, 301, 401-405, 408, 602, 607, 608, 611, 613, 616, and 801-806, as well

---

[12] Issues are ripe. See Montgomery. C.P. Case Number 2009 CV 5176, J. Wiseman, (August 25, 2011), at pp. 7-8.

as other evidence principles established at common law and/or by Constitution. (Ohio Courts Act, Ohio Const. Article IV, § 5(B); Separation of Power Doctrine.) United States Constitution I, V, and XIV Amendments

615. The Plaintiffs maintain the right to bring a claim for the reasonable value of medical expenses for the care and treatment of the decedent, as charged and not as actually paid, including future care and treatment.[13]

616. The Court should determine Ohio Rev. Code § 2323.41 to be unconstitutional and/or a denial of equal protection as compared to other torts (i.e. Ohio Rev. Code § 2315.20), and as violative of collateral benefits evidentiary rules.  The Court should further declare Ohio Rev. Code § 2323.43 unconstitutional under the federal and Ohio constitutions.

617. Should the Court determine that the Defendants have the right to present any said claims, the Court should further order that they proceed to do so under the same standards as Plaintiff against the Defendants, by utilizing their own lawyers, naming their own expert and lay witnesses, following all procedures and presenting all evidence as directed by the Federal and State Rules of Evidence, Federal Civil Rules, common law, and the scheduling order of the Court, or forfeit said rights if not presented by the pretrial conference or pursuant to Rule 26.  Fed. Civ. R. 16, 26(f).

---

[13] Pursuant to Ohio Rev. Code § 2323.41(A).  See *Jacques v. Manton*, Lucas Cty. App. No. L-08-1 096, 2009-Ohio-1468, ¶11; *Witzmann v. Adam* (Jan. 10, 2009), Montgomery County C.P. No. 2005-CV-4086; *Palm v. Burmeister*, Lucas Cty., C.P. No. CF 06-357; *Almaugher v. King*, Lucas Cty. C.P. No. G-4801-CI-000; *Benson v. Nationwide Mut. Fire Ins. Co.*, Fairfield Cty. C.P. No. 07 CV 56; *Clansen v. Lester*, Fulton Cty. C.P. 07CV0001223; *Kissenger v. Hollosi*, Lucas Cty. C.P. No. G-4801-CI-200703285-000, but see *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362.

618.  Plaintiffs ask that the Court declare that the provisions of S.B. 281, relating to Medical Malpractice Claims effective April 9, 2003, and H.B. 215, relating to Medical Liability Actions effective September 13, 2004, and S.B. 120 (joint and several liability) effective April 9, 2003, and the abrogation of the collateral source rule, as well as applicable sections of S.B. 80 (tort reform), effective April 7, 2005, are unconstitutional and in violation of the provisions of the Ohio and United States Constitutions, both on their face, and as applicable to the Plaintiff in the case at bar as well as all citizens of Ohio. The Court should acknowledge and declare that these acts are violative of, among other provisions, the U.S. Constitution, First, Fifth, and Fourteenth Amendments, the Ohio Constitution, the right to equal protection established in Article I, Section 2; the right to a trial by jury established in Article I, Section 5; the right to remedy, due process, and the right to open courts established in Article I, Section 16; Article I, Section 2 prohibiting special rights, immunities and privileges for medical claim providers, the single subject rule established in Article II, Section 15; and the Ohio Supreme Court's authority in prescribing the rules governing practice and procedure in Article IV, Section 5, Due Process and Equal Protection, as well as any other applicable reasons presented to the Court on their face and by way of motion by the Plaintiff.

619.  The Attorney General of the State of Ohio will timely be served with a copy of this Complaint pursuant to the requirements of Ohio Rev. Code § 2721.12 by certified U.S. Mail service.

## TWENTY-SECOND CAUSE OF ACTION
### (Declaratory Relief)

### (Medical Negligence as to Cleveland Clinic Patients –Eisnaugle, Fulmer, Mergler, Razem, , Wade and Williams Against Defendants Cleveland Clinic Foundation, Cosgrove, Kaouk, Goel, Zhao, Gill, Hafron, Kefer, Hegarty, Lee, Matthews, Stephenson, Wood, Nguyen, Weight, Subramanian, Aron, El-Hayek, and Henderson)

620.   Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

621.   Plaintiffs seek declaration from the Court regarding the status of any allegedly necessary parties, "empty chair" defendants, or other unnamed parties to whom the Defendants herein may intend to assign any portion of liability in the case at bar or claim that the presence of is necessary/indispensable for any purpose of pleading, trial, or litigation, to find that there is no right to any set-off for any Defendants by any non-named party.

622.   Plaintiffs ask the Court to declare for pleading and trial purposes, pursuant to Ohio Rev. Code § 2307.23 and Ohio and Federal Civil Rule 27-22, that the named Defendants cannot establish late affirmative defenses, or otherwise attempt to shift liability or responsibility for Plaintiff' injuries to any person who the Defendants claim may be liable for all or part of the injuries and damage suffered by the Plaintiff, or who Defendants claim is otherwise a necessary / indispensable party for this action, but who has not already been named as a Defendant in this action.

## TWENTY-THIRD CAUSE OF ACTION
### Ohio False/Misleading Advertising; Unfair and Deceptive Trade Practices

623.   Plaintiffs  incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

624.   Unfair and deceptive trade practices include (but are not limited to) publishing and/or somehow "placing before the public" any untrue, deceptive, or misleading claims or assertions with respect to the insurance business (and business in general).[14]

625.   All Defendants have engaged in unfair and deceptive acts or practices that are unlawful.  Defendants falsely misrepresented the level of care and quality of their services.  Defendants falsely misrepresented their credentials, surgical outcomes, and the level of risk involved in robotic hysterectomies.   Defendants knew, or should have known, that Defendants were falsely misrepresenting information about robotic hysterectomies.   At the very least, Defendants should have had some policy or procedure in place to confirm Defendants' claims and representations were true.  Defendants failed to, however, create, implement, and utilize any such policy or procedure – resulting in Plaintiffs' injuries.

626.   All Defendants failed to properly verify Defendant surgeons' credentials to provide health care to Plaintiffs and other patients.

627.   The Ohio State Medical Board ("Medical Board") can penalize physicians for false, misleading, and deceptive advertising.   Penalties include revocation of the physician's license to practice medicine.  While there is no private right of action

---

[14] (See O.R.C. §§ 3901.19 through 3901.26, 3963.09(A); Generally, any advertisement that falsely or misleadingly induces a consumer to purchase a product, utilize a service, or refrain from purchasing a product or utilizing a service is considered deceptive

under this statute, it shows the condemnation and severe consequences of false and misleading advertising by physicians and other health care providers.  By specifically delegating this power to the Medical Board, the Ohio legislature has shown it strongly condemns health care providers' false and misleading advertising.

628.   Furthermore, Defendants should be held liable for Defendants' misuse of the da Vinci and misrepresentations about the da Vinci's efficacy in robotic hysterectomies.  Not only did Defendants misrepresent the outcomes and success rates of the da Vinci, but Defendants used those misrepresentations in their consultations and recommendations to Plaintiffs and other patients.  Defendants knew, or should have known, that Plaintiffs and other patients were being told the da Vinci had far better success rates and outcomes than was true.

629.   The Defendants also, through the media, represented the utility, benefits, superiority, and preference of the Robotic/Da Vinci devices to the Plaintiffs and to the public.

630.   The said advertising was false and misleading.

631.   The Plaintiffs, and other like and similar patients, and upon information and the behalf of the public relied upon the information.

632.   The advertising was material to Plaintiffs and violates learned intermediary or physicians consent about efficiency and safety.

633.   The false advertising proximately caused the injuries and damages to the Plaintiffs.

## TWENTY-FOURTH CAUSE OF ACTION
## DISGORGEMENT/UNJUST ENRICHMENT

**Pursuant to *Langer v. Langer*, 123 Ohio App.3d 348, 355, 704 N.E.2d 275 (1997); *Klaustermeyer v. Cleveland Trust Co.*, 89 Ohio St. 142, 105 N.E. 278 (1913); *Globe-Wernicke Co. v. Safe-Cabinet Co.*, 110 Ohio St. 609, 144 N.E. 711 (1924) paragraph 3 of the syllabus; *Klosterman v. Fussner*, 99 Ohio App.3d 534, 538, 651 N.E.2d 64 (1994); *Pryor v. Webber*, 23 Ohio St.2d 104, 263 N.E.2d 235 (1970); *Hutchings v. Childress*, 119 Ohio St.3d 486, 491, 895 N.E.2d 520 (2008); 76 Fed. Reg. 33 at 9285; 76 Fed. Reg. at 9287-9288; *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 834 N.E.2d 791 (2005); *Smith v. Vaughn*, 174 Ohio App.3d 473, 882 N.E.2d 941 (2007).**

634.   Plaintiff incorporates the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

635.   The payment of funds by the Plaintiff's health plans and/or Plaintiff, have resulted in the unjust enrichment of Defendants.

636.   These Defendants should be responsible for any payment to which they are entitled by the acts enumerated and should be disgorged of said funds and be made responsible for payment of additional funds expended.

637.   Therefore any and all funds received from governmental or private health care insurers or other legitimate payees not acting concert or combination with Defendants to the health care providers, or plaintiff.

## TWENTY-FIFTH CAUSE OF ACTION
## RATIFICATION AND ADOPTION, AGENCY/RESPONDENT SUPERIOR

j.   **Pursuant to *Meyer v. Klensch*, 114 Ohio App. 4, 175 N.E. 2d 870, 872 (1961); *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 374 (6th Cir. 1993); *Mid-America Tire, Inc. v PTZ Trading, Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, 768 N.E.2d 619; *Master Consol. Corp. v. BancOhio Nat'l Bank*, 61 Ohio St.3d 570, 577, 934 N.E. 394 (1991).**

638. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

639. The Defendants have aided jointly as joint agencies, agents by estoppel, apparent agents, and joint ventures in respondent superior capacities in regards to the claims averred herein.

640. The Defendants jointly through their acts have adopted, or otherwise ratified, or estoppel to deny, all acts of on for each other and one for all (jointly and severally).

### TWENTY-SIXTH CAUSE OF ACTION
### INFLICTION OF SEVERE INTENTIONAL/NEGLIGENT MENTAL ANGUISH

### Pursuant to OJI CV 429.05 OJI CV 429.07; *Yeager v. Local Union 20, Teamsters*, 6 Ohio St. 3d 369, 453 N.E.2d 666 (1983)

641. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

642. Defendants intentionally, recklessly, and negligently acted in an extreme and outrageous manner, so as to cause serious emotional distress to the Plaintiff, resulting in injuries and damages.

643. Defendants' conduct, acts, and omissions are so outrageous in character and so extreme in degree that they go beyond all possible bounds of decency and may be regarded as utterly intolerable and atrocious in our society.

644. The Defendants' acts are especially intolerable as they relate to the Plaintiffs' and societies' expectation and rights to health care, safety, and welfare.

110

645. Where such acts by the Defendants constitute crimes and/or are prohibited by certifying bodies, they are especially intentional or reckless.

646. The Defendants' actions proximately caused Plaintiff's psychological and physical injuries.

647. The Plaintiffs' mental injuries were serious and of a nature that no reasonable man could endure and was reasonably foreseeable negligence by the Defendant.

## TWENTY-SEVENTH CAUSE OF ACTION
### (Loss of Consortium)

648. Plaintiffs incorporate the allegations in the previous and subsequent paragraphs of this Complaint as if fully rewritten herein.

649. Lucy Chyi is the wife of Plaintiff Lindgren Chyi.

650. Sandy Eisnaugle is the wife of Plaintiff Edmund Eisnaugle

651. Karen Fulmer is the wife of Plaintiff Mark Fulmer.

652. Concetta Gagliano is the wife of Plaintiff Daniel Gagliano.

653. Jacinta Mergler is the wife of Plaintiff Michael Mergler.

654. Ann Perrotti is the wife of Plaintiff John Perrotti.

655. Carol Razem is the wife of Plaintiff John Razem

656. Carol Sposit is the wife of Plaintiff Donal Sposit.

657. Denise Wade is the wife of Plaintiff Donald Wade.

658. Emily Napolitano is the wife of Plaintiff Ralph Napolitano.

659. Mary Cox was the wife of Plaintiff William Cox

660. Lori Griffith is the wife of Nathaniel Griffith.

661. James Hoke is the husband of Jacqueline Hoke.

662.    Danny Neal is the husband of Tracy Neal.

663.    Jack Cronk is the husband of Ruth Cronk.

664.    Mary Hasty is the wife of Ernie Hasty.

665.    Rebecca Kratzer is the wife of Larry Katzer.

666.    Martha Kirkbride is the wife of Walter Kirkbride.

667.    Kathy Moody is the wife of Robert Moody.

668.    As a direct and proximate result of the conduct described in this Complaint, the above named Plaintiffs have lost the services of their spouses, their consortium, included but not limited to loss of society, companionship, affection, comfort, guidance, and counsel of their spouses and have otherwise suffered pecuniary and non-pecuniary injuries.

669.    The above named Plaintiffs are entitled to recover damages for Defendants' actions as plead herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment, jointly and severally, against any named Defendant who is deemed to be liable to the Plaintiffs for the following:

a.    Compensatory damages in an amount greater than $25,000.00;

b.    Punitive damages in an amount greater than $25,000.00;

c.    Their costs of this action to include reasonable attorney fees;

d.    Plaintiffs further ask the Court to issue a declaration of the unconstitutionality, in whole or in part, of medical malpractice tort reforms under S.B. 281 and H.B. 215, and tort reform statutes under S.B. 120 and S.B.

80 (as applicable);

e.    Plaintiffs further ask the Court to issue a declaration with that the subrogation liens for their medical bills will be paid by the Defendants.

f.    Plaintiffs further ask for a declaration on the admissibility in full of Plaintiffs' Medical Bills under Ohio Rev. Code § 2323.41(A), making the amount of those bills prima facie reasonable and necessary;

g.    Plaintiffs  further ask the Court to issue a declaration that there is no right to set-off, and that any claim of any right to contribution or indemnification must be brought in a completely separate action only among Defendants found liable in tort, and there is no right to involve any third party in this case as an affirmative defense or otherwise (empty chair, settling defendant, or other non-party);

h.    Plaintiffs further ask the Court to issue a declaration that no other party, not already a named party to this suit or as provided in an Amended Complaint under Fed. Civ. R. 15, (except by Defendants in a timely responsive pleading) can be found liable in tort or brought into the case at bar;

i.    Plaintiffs further ask the Court to declare that there is no right to set-off for any payments made by any Defendants for non-medical-malpractice claims of separate torts and contractual actions, and all other claims are not subject to set-off as they are separate, distinct, intentional, or otherwise.

j.    Plaintiffs further ask for pre-judgment and post judgment interest at the statutory rate;

k.    Plaintiffs ask the Court to declare the practice of jail recording to be unconstitutional/unlawful per se or as applied in this case; and

l.    For such other and further relief to which they may be deemed entitled at law or equity.

Respectfully submitted,


s/Dwight D. Brannon
Dwight D. Brannon (0021657)
Attorneys for Plaintiffs
BRANNON & ASSOCIATES
130 W. Second St.        Suite 900
Dayton, OH   45402
Telephone:        (937) 228-2306
Facsimile: (937) 228-8475
E-Mail:      dbrannon@branlaw.com


**JURY DEMAND**

Now come Plaintiffs, by and through counsel, and respectfully demand a trial by jury on all issues in this case.

/s/ Dwight D. Brannon
Dwight D. Brannon